# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Marion Alexander Lindsey, Petitioner,

v.

State of South Carolina, Respondent.

Appellate Case No. 2019-001271

─────────────

## ON WRIT OF CERTIORARI

─────────────

Appeal from Spartanburg County
Paul M. Burch, Circuit Court Judge

─────────────

Opinion No. 28304
Heard September 12, 2023 – Filed November 5, 2025

─────────────

## AFFIRMED IN RESULT

─────────────

Chief Appellate Defender Robert Michael Dudek, Appellate Defender David Alexander, and Appellate Defender Lara Mary Caudy, all of Columbia, for Petitioner.

Attorney General Alan McCrory Wilson, Deputy Attorney General Donald J. Zelenka, and Senior Assistant Deputy Attorney General Melody Jane Brown, all of Columbia, and Solicitor Barry Joe Barnette, of Spartanburg, for Respondent.

─────────────

**JUSTICE JAMES:** This lengthy death penalty post-conviction relief proceeding began in 2007, and the PCR court denied relief in 2010. In 2014, we remanded to the PCR court for further proceedings, after which the PCR court again denied relief. We granted Marion Alexander Lindsey's petition for a writ of certiorari to review the PCR court's decision. Lindsey raises issues concerning the PCR court's signing of a proposed order submitted by the State, and he raises issues concerning trial counsel's preparation and presentation of his mitigation case during the penalty phase of his jury trial. We affirm the PCR court in result.

## I. Background

On September 18, 2002, Lindsey murdered his estranged wife, Ruby Nell Lindsey (Victim), by shooting her as she sat in the back seat of her friend's car in the parking lot of the Inman Police Department. A Spartanburg County jury convicted Lindsey of murder and recommended a death sentence, which the trial court imposed. We affirmed the conviction and sentence. *State v. Lindsey*, 372 S.C. 185, 642 S.E.2d 557 (2007). The United States Supreme Court denied Lindsey's petition for a writ of certiorari. *Lindsey v. South Carolina*, 552 U.S. 917 (2007).

Lindsey filed for PCR in 2007. At the conclusion of Lindsey's 2010 PCR hearing, the PCR court requested and obtained proposed orders from both sides. The PCR court dismissed the application with prejudice in an order identical to the State's proposed order. Lindsey petitioned this Court for a writ of certiorari, arguing the PCR court's verbatim adoption of the State's proposed order violated his constitutional rights. In our order dated September 30, 2014 (Remand Order), we vacated the dismissal of Lindsey's application and remanded the case to the PCR court, directing it to issue an order that (1) included findings of facts and conclusions of law on each issue presented in Lindsey's PCR application, with accurate references to the record and applicable law and (2) complied with *Pruitt v. State*, 310 S.C. 254, 423 S.E.2d 127 (1992); *Hall v. Catoe*, 360 S.C. 353, 601 S.E.2d 335 (2004); and S.C. Code Ann. § 17-27-80 (2014).

On remand, the PCR court asked the parties for their original proposed orders. In response, Lindsey petitioned this Court for a de novo PCR hearing before a different judge, contending the PCR court violated our Remand Order by requesting the same proposed orders. We denied Lindsey's request. Subsequently, the PCR court issued an amended order, again denying Lindsey relief. Lindsey again petitioned this Court for a new hearing, arguing the amended order was the same as the original PCR order except for the correction of some typographical errors. We denied that petition as well.

Lindsey then petitioned this Court for a writ of certiorari, which we granted. The following issues are before us:

**1. Did the PCR court disobey this Court's order and violate state law and Lindsey's constitutional rights by adopting the State's proposed order of dismissal "under circumstances showing the PCR court failed to consider Lindsey's grounds for PCR and did not even read the proposed order before signing it"?**

**2. Did trial counsel provide ineffective assistance by failing to properly investigate and present an adequate mitigation defense?**

## II. Facts

On September 17, 2002, Lindsey was arrested on an outstanding criminal domestic violence warrant. The charge arose from an incident during which Lindsey hit Victim and tore off her jewelry in an Applebee's parking lot. He was released on bond the evening of his arrest.

The next evening, Victim's close friend, Celeste Nesbitt, picked up Victim from Victim's job at a local hospital to give her a ride home. Nesbitt was driving a Mercury sedan with tinted rear windows. Nesbitt's mother was in the front passenger seat, and Victim was seated in the back seat behind Nesbitt. Nesbitt's two daughters, aged four and nine, were in the back seat with Victim. Victim and Lindsey were separated at the time, and Victim was living with her mother. When Nesbitt and Victim neared Victim's mother's house, they saw Lindsey in his girlfriend's car. Instead of going to Victim's mother's house, Nesbitt pulled her car into a neighbor's yard, turned around, stopped in the middle of the road, rolled down her window, and spoke to Lindsey. Lindsey asked Nesbitt if she had spoken to Victim. Nesbitt, knowing Lindsey had recently threatened Victim, told Lindsey she had not seen Victim for three days. Nesbitt's four-year-old leaned forward in her car seat to say hello to Lindsey. Lindsey asked Nesbitt who else was in the back seat, and Nesbitt told him her other daughter was also in the back seat. Lindsey asked Nesbitt to roll down her back window so he could see who was in the back seat, but Nesbitt told him the window was broken. When Lindsey said he would get out of his car and look, Nesbitt sped off and headed to the Inman police station, running stop signs and stop lights along the way. Lindsey followed closely behind.

Victim called 911 as Nesbitt drove to the police station, and both cars arrived at the same time. Lindsey exited his car and demanded Victim get out of Nesbitt's car. When Victim refused, Lindsey fired a handgun four times through the tinted

rear driver's side window, killing Victim and narrowly missing the children in the back seat. A police officer in the parking lot fired at Lindsey. Lindsey was treated and hospitalized for gunshot wounds, including one to the head, which Lindsey claims he inflicted in an attempt to kill himself.

Lindsey was indicted for murder in October 2002, and the State served Lindsey with a death penalty notice, notice of intent to seek a life without parole sentence, and notice of statutory aggravating circumstances. The State listed one statutory aggravating factor: under section 16-3-20(C)(a)(3) of the South Carolina Code (2015), Lindsey's "act of murder knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which normally would be hazardous to the lives of more than one person."

## III. Trial

### A.

During the guilt phase of his 2004 trial before then-circuit judge John C. Few, Lindsey admitted he shot and killed Victim. His defense centered on the theory that at the time of the shooting, he was depressed because Victim was keeping him from their two minor sons. He contended he snapped and killed Victim without the malice aforethought required for murder. The State presented the narrative of a man who stalked his wife and killed her in cold blood. The jury found Lindsey guilty of murder.

### B.

During the penalty phase, the State presented evidence of several instances in which Lindsey physically abused Victim, including those in which he: (1) hit Victim "so hard . . . he almost broke her jaw" in a parking lot while on a family vacation for "com[ing] back too late"; (2) hit Victim for not coming to pick up milk from him; (3) knocked out the window of Victim's car, sending broken glass over Victim and their son; and (4) assaulted Victim in an Applebee's parking lot. The State presented evidence showing Lindsey had been ordered to stay away from Victim by a magistrate the day before the murder. The State also presented evidence (1) Lindsey was convicted of assault and battery with intent to kill (ABWIK) after shooting an ex-girlfriend's new boyfriend through the man's car windshield;[1] (2) Lindsey had

---

[1] Stanford Wilkins testified during the penalty phase that Lindsey shot him with a .45 caliber handgun in February 1994. Wilkins was driving his vehicle on a public road in Spartanburg County with Jessica Cannon in the front passenger seat. Lindsey

drug trafficking charges pending against him at the time of his murder trial; (3) Lindsey never attempted to gain custody of his children through legal means; and (4) Nesbitt's older daughter suffered emotional and psychological trauma as a result of the murder.

James Sligh, the Division Director of Classification of Inmate Records for the South Carolina Department of Corrections (SCDC), testified during the penalty phase that if Lindsey were sentenced to life imprisonment, he would be in contact with other inmates, hold jobs, participate in recreational activities, and have visitation rights. The State emphasized Lindsey murdered Victim at a police station—a public place that should have been a refuge for Victim and, in the process, put others in danger, including Nesbitt's children, who were seated in the back seat with Victim when Lindsey shot her.

## C.

Lindsey claims trial counsel was ineffective in failing to prepare and present an adequate mitigation case. The mitigation case trial counsel presented during the penalty phase emphasized Lindsey's poverty-stricken upbringing, his depression, and his various intellectual deficiencies. The following is a summary of the testimony of Lindsey's mitigation witnesses.

### 1. Ann Howard

Ann Howard, a registered nurse and mental health professional employed by the Spartanburg County Mental Health Center, testified she met with Lindsey in the detention facility the night of the shooting. Though she was neither offered as an expert nor permitted to give any opinions, she testified Lindsey appeared depressed and suicidal, and she noted that after the shooting, a psychiatrist prescribed Lindsey antidepressants, mood stabilizers, and antipsychotic medications.

### 2. Margaret Melikian, M.D.

Margaret Melikian, M.D. was qualified before the jury as an expert in forensic psychiatry. At the time of trial, she was the Program Director of Forensic Psychiatry at the Medical University of South Carolina. Her duties included performing competency and criminal responsibility evaluations for the Department of Mental

---

blocked Wilkins' vehicle with his Honda Accord and fired twice through Wilkins' windshield, striking Wilkins in the arm. Lindsey pled guilty to ABWIK.

Health. Before Lindsey's trial, she had been qualified as an expert in forensic psychiatry approximately ten times in South Carolina courts.

Dr. Melikian testified she reviewed Lindsey's school records and medical records, including records of a psychiatric hospitalization after Lindsey attempted suicide at age fifteen, and his neuropsychological records. She testified Lindsey had major depressive disorder and was significantly depressed at the time he shot Victim. Dr. Melikian based her diagnosis on Lindsey's school records, which showed he had learning and speech disabilities; his multiple past head injuries resulting from being run over by a car when he was about eighteen months old, a motorcycle accident, and a car accident; an incident in which he ingested kerosene as a baby; cognitive deficits affecting his fine motor skills, dexterity skills, memory, and verbal skills; his family's history of depression; a drug-overdose suicide attempt at age fifteen; and his suicidal ideation and extreme weight loss in the weeks leading up to the murder.

Dr. Melikian testified Lindsey's low intelligence limited his ability to cope with stress, and she testified the stress of separating from Victim further decreased his coping abilities. Dr. Melikian testified Lindsey reported he had been suicidal for several weeks before the murder and that during the three weeks before the murder, Lindsey's weight dropped from 225 pounds to 160 pounds.

She related to the jury that after the murder, Lindsey was evaluated at the William S. Hall Psychiatric Institute, a facility operated by the South Carolina Department of Mental Health. She testified testing at Hall showed Lindsey had an IQ of 76, with retesting showing an IQ in the 80s. She testified Lindsey was diagnosed at Hall with borderline intellectual functioning. She recommended he be evaluated by a behavioral neurologist because of abnormalities in his psychological testing. Lindsey was seen by behavioral neurologist Dr. Absher, who reported Lindsey had a normal neurological exam.

Dr. Melikian testified Lindsey's neuropsychological testing (performed by Dr. Brawley) showed Lindsey "had some abnormalities having to do with naming and being able to copy designs, dexterity, and fine motor skills." She testified that based on those results, Lindsey had cognitive deficits, i.e., problems thinking or acting. She explained the deficits included decreased verbal fluency (naming words), processing memory, difference in dexterity on the right and left, and motor speed differences on the right and left. Dr. Melikian testified a brain abnormality was the cause of Lindsey's "low test scores and sudden neurological findings." She testified the brain abnormality was either something Lindsey was born with or was caused by a traumatic head injury or ingesting kerosene. She testified Lindsey put forth good effort during testing and was not malingering.

Dr. Melikian testified Lindsey used an imaginary friend named "Jimmy" as a coping mechanism when suffering stress. She testified Lindsey claimed Jimmy was present in the hospital after he attempted suicide at age 15. She acknowledged on cross-examination that Lindsey first mentioned Jimmy on the day he was served with the State's death penalty notice. However, she then testified it would not be unusual for Jimmy to appear on that day, because Lindsey used Jimmy as a mechanism to cope with stress, and receiving a death notice was undoubtedly one of the most stressful things to ever happen to Lindsey. She persisted in her opinion that Lindsey was not malingering, stating quite clearly that she disagreed with Dr. Narayan, who was of the opinion Lindsey was malingering. Melikian testified Lindsey was using Jimmy as a coping mechanism, not as an alternative source of blame to escape responsibility for his crimes. She also insisted on cross-examination that the report of an imaginary friend has nothing to do with a diagnosis of mental illness, and she stated "[Lindsey] is suffering from depression regardless of whether he had the hallucination of the imaginary friend or not. I'm not sure that that would change, it would not change his neurological impairment or his low IQ."

Dr. Melikian also testified on cross-examination that Lindsey's depression, cognitive deficits, and low IQ did not cause or excuse the murder; she clarified "these are mitigating factors and should be considered in the imposition of a death penalty."

### 3. *Virginia Lindsey*

Virginia Lindsey, Lindsey's mother (Mother), testified she raised Lindsey and her three other sons in a small two-bedroom house. She and Lindsey's father never married, and Lindsey's father was never involved in his life. She testified Lindsey was one of four boys, but one drowned at a young age. She also testified she had a daughter who died at age seven months in a car accident. She described Lindsey as "a very loving, sweet child." Mother testified Lindsey ingested kerosene when he was nineteen months old, and about a month after that, Lindsey's uncle backed over his head with a car. She testified Lindsey was "slow in school," repeated eighth grade three times, and had speech problems. She knew of only one fight he had been in at school. She testified her other two sons' father would pick them up on weekends[2] and leave Lindsey at home, which upset Lindsey greatly. She testified Lindsey was hospitalized after attempting suicide when he was fifteen. She told the jury Lindsey and Victim had a good relationship, she never saw Lindsey hit Victim,

---

[2] In her testimony, forensic psychiatrist Margaret Melikian stated the notation that Lindsey repeated eighth grade three times was a misstatement—she testified the school records were confusing but reflect he repeated first grade and seventh grade.

and Lindsey loved his sons very much. She also stated Victim had not allowed Lindsey to see his sons in the two months prior to the shooting, and she noted Lindsey was very depressed about not seeing his children. Mother asked the jury to show mercy to Lindsey.

### 4. Bill Burton

Bill Burton testified he was a lifeguard at a public pool in his teens and befriended Lindsey and his brothers when they were small and frequented the pool. He taught Lindsey how to swim. He took them to Spartanburg Phillies games, to Burger King, and fishing at a pond on his family's property. Burton testified Lindsey and his brothers were very polite to his parents. He testified Lindsey and his brothers grew up in a "rough situation" and in "desperate poverty," "without the benefit of parents like normal families." He said Lindsey and his brothers lived with their mother in a 1,000-square-foot home with several other people. Burton testified Lindsey was like many kids from poverty looking for attention. He testified he did not know Lindsey to be violent. Burton also testified that when Lindsey was about nineteen, he got Lindsey a job at the company where he was employed.

On cross-examination, Burton admitted he had just learned about Lindsey shooting Stanford Wilkins through Wilkins' windshield. He also admitted there were many other disadvantaged children in the area who grew up without a mother or a father and Lindsey was lucky to have someone like him. He also testified that if Lindsey had called him to ask for help in getting visitation with his children, he would have helped him get a lawyer.

### 5. Leon McDowell

Leon McDowell, Lindsey's father, testified he was not involved in Lindsey's life other than occasionally giving him money. He testified he "was never a father to" Lindsey and regretted that fact. He also testified to the jury that "if [they] can see fit not to execute [Lindsey], maybe he can [be a] benefit to his kids somehow."

### 6. Chris Wilkins

Chris Wilkins testified he was related to Lindsey and they "were like brothers." He testified he had known Lindsey since they were thirteen years old. He testified Lindsey was a loving father, was very close to his children, and tried hard to provide for his family. He testified Lindsey, Victim, and their children lived with him for a time and they "raised [their] kids practically together." He never saw Lindsey hit Victim or hurt anyone on purpose. He testified Lindsey would mumble to himself on occasion, usually when he was stressed. Wilkins asked the jury to take

into consideration the kind of father Lindsey was and asked the jury to show mercy to Lindsey. On cross-examination, Wilkins admitted Lindsey shot Stanford Wilkins through Stanford's windshield and that Lindsey cold cocked Victim in an Applebee's parking lot.

### 7. Steve Pilgrim

One of Lindsey's uncles, Steve Pilgrim, testified during the penalty phase. He testified he lived with Lindsey, Mother, and Lindsey's brothers for about seven years while Lindsey was growing up. He testified he took Lindsey to the hospital after Lindsey's head was run over by a car as a child, and he also testified he was aware Lindsey ingested kerosene as an infant. Pilgrim testified he and his daughter suffered from panic attacks.

### 8. Bessie Smith

Bessie Smith, one of Lindsey's aunts, testified she and her husband lived with Lindsey, Mother, and Lindsey's brothers for a time. She testified that when Lindsey was a child, he had a kitten he adored. She testified one of Lindsey's uncles killed the kitten by throwing it into their house's heating unit. She testified Lindsey "was very hurt by that" and "talked about it for a long time."

### 9. Lindsey's Statement to the Jury

Lindsey did not testify during either phase of the trial, but during closing arguments, he asked the jury to spare him so he could be a father to his children. He stated that if he serves a term of life in prison, "I could still be of some use to my boys." He said he was the best father he could be. He expressed remorse for killing Victim and for all the pain he had caused to the family and to everyone who loved and missed Victim and stated he would do anything to bring her back.

### 10. Counsel's Closing Argument

While Mr. Bartosh's closing argument was not evidence, we summarize it nonetheless. He emphasized Dr. Melikian's testimony about Lindsey's cognitive deficits, his depression, and possible brain damage. He also recounted Mother's testimony about Lindsey's head injury, his inhaling kerosene, that he was "slow," had speech problems, did poorly in school, and repeated the eighth grade three times. He emphasized Lindsey grew up without a father and wanted to be a father to his children so Lindsey's children would never experience the environment he experienced. He explained that even though Lindsey's issues did not excuse the murder, his background helped "explain to you how Marion Lindsey can end up

sitting at that table" and that "[n]one of us can sit here and say how we view the situations like [Lindsey] did with his handicap." He also emphasized the evidence Lindsey was depressed, suicidal, and lost weight during his last separation from Victim. He noted Dr. Melikian's testimony about Lindsey's state of mind and argued "[a]ll of the frustration, all of the depression, all of the loss of his children all came together" at the time of the murder. He also noted Lindsey's attempt to commit suicide by shooting himself in the head while still in the parking lot.

The jury found the State proved the existence of a statutory aggravating circumstance and recommended Lindsey be sentenced to death. The trial court imposed a death sentence. We affirmed Lindsey's conviction and sentence. *Lindsey*, 372 S.C. at 188, 642 S.E.2d at 558. This PCR proceeding followed.

## IV. PCR Hearing

### A.

Several witnesses who testified during the PCR hearing provided testimony related to the preparation and presentation of mitigation evidence.

#### 1. Doug Brannon

Mike Bartosh, Lindsey's lead trial counsel, passed away before the PCR hearing. Doug Brannon, a private attorney and second chair at Lindsey's trial, testified during the PCR hearing that he was not appointed to the case until March 5, 2004, roughly two months before trial began. Mr. Brannon testified Mr. Bartosh was one of the finest lawyers he knew, and he jumped at the chance to assist. Mr. Brannon explained he mainly worked on the guilt phase of the trial, while Bartosh focused on the penalty phase. Brannon testified he was not privy to all of Bartosh's preparation for the penalty phase; however, Brannon testified he and Mr. Bartosh discussed Dr. Melikian's pending testimony about Lindsey's mental state. He explained Bartosh believed the best mitigation route was to emphasize Lindsey's troubled upbringing and borderline intelligence level.

#### 2. Karen Quimby Hatcher

Ms. Hatcher, a Spartanburg County assistant public defender and third chair on the defense team, testified she was not appointed until after mid-March of 2004; her role was to organize files and act as a go-between for Bartosh and the mitigation investigator, Lenora Topp. Hatcher testified she had no part in calling witnesses or making strategic decisions.

### 3. Lenora Topp

Ms. Topp was a law enforcement officer from 1975-1990 and began private investigative work in 1991. She testified she was recommended to the defense team as a mitigation investigator by attorney Jeff Blume. She began working on the case on April 16, 2004, a little more than a month before trial began. She described her role as gathering records. She testified she did not have enough time to complete her investigation and was, therefore, unable to obtain Lindsey's aunts' medical records. She was also unable to contact Dr. Barry Henderson, Lindsey's childhood physician, until the day after the death sentence was delivered. She wanted Lindsey's medical records, but was not able to ask Dr. Henderson to testify during trial. She testified she learned from Dr. Henderson that his children played with Lindsey when they were little, and that he would have been willing to testify. Dr. Henderson died in 2006, well before the PCR hearing.

On cross-examination, Topp testified she was a mitigation investigator in three other death penalty cases in South Carolina, and she did not have enough time to complete her investigation in any of those cases, having "no more than two months" for each one. She testified she had two major interviews with Lindsey and obtained a lot of information from him, such as being run over by a car, never having new clothes, living in a small house and sleeping in one bed with his brothers, being very poor, and not having a father figure. She testified "Jimmy" was not in the room when she talked to Lindsey. She testified Lindsey told her that on the day of the murder, he was very upset his wife was having an affair with a man who would take over raising his children. She testified Lindsey told her he was affected severely when his brother Paul drowned. She stated Lindsey described his older brother Timothy Sims as like a father. She testified Lindsey told her he sold drugs because he needed money and liked the lifestyle it allowed. She testified she was aware before trial that Lindsey shot another man through a car windshield, that he had relationships with other women while he was married, and that Lindsey supposedly had an imaginary friend named "Jimmy."

In sum, almost all of what Ms. Topp summarized during her PCR testimony was communicated to the jury by witnesses.

### 4. Mother

Mother's testimony during the PCR hearing was very similar to her trial testimony. Mother testified she raised Lindsey in a "rough neighborhood" where drinking, drug dealing, and violence were normal. She testified Lindsey was raised in poverty in a small home with as many as twelve family members living there.

Mother testified her live-in boyfriend of twenty years had a "real bad drinking problem" and was violent toward Lindsey, even when Lindsey was a young child. Mother explained that while her other children spent time with their fathers, Lindsey's father was not a part of his life. She also noted her brothers lived with them and were violent, fought often, owned weapons, once got into a shootout at their home, and threw Lindsey's kitten into the house's heating unit. As she did during trial, Mother testified Lindsey suffered several medical emergencies as a child, including ingesting kerosene when he was a baby and his uncle backing over his head. She added head injuries she did not relate during her trial testimony, specifically Lindsey falling twice when he was six or seven and hurting his head and receiving another head injury when he was in a car wreck at sixteen years old. She recounted Lindsey's attempt to kill himself when he was fifteen years old. Mother stated Lindsey received poor grades in school, had to repeat some grades, and dropped out at age seventeen. She testified Lindsey sold illegal drugs to support the family, and even though he sometimes had "legal" jobs, he would quit because he made more money selling drugs. Mother stated Lindsey was a good father, and she said she never saw him hit Victim; she further testified that when Lindsey and Victim separated, Victim would not let Lindsey see his children. She testified he then became depressed and considered suicide, writing multiple suicide notes that she gave to Rodman Tullis, Lindsey's former attorney.

### 5. *Bessie Smith and Steve Pilgrim*

During their PCR testimony, Lindsey's aunt Bessie Smith and his uncle Steve Pilgrim—both of whom also testified during the penalty phase—provided similar accounts of the violence prevalent in Lindsey's childhood home and noted Lindsey's and his family's mental health struggles. Specifically, Ms. Smith testified Lindsey's uncles drank and were violent; Lindsey's other aunt had drug abuse problems; and Mother had drinking problems, leaving Lindsey's care to other family members. Smith testified that two weeks before Victim's murder, Lindsey was depressed and contemplated suicide, but his family decided not to seek professional or medical help for him. She also stated Lindsey was very upset about not being able to see his children. Mr. Pilgrim testified Mother and two of Lindsey's aunts had attempted suicide. Pilgrim testified Lindsey's other uncles and one of his aunts acted violently toward family members and others around Lindsey. He also stated he lived in the small house with Lindsey, and the house did not have indoor plumbing or air conditioning and had a coal/wood stove for heat.

### 6. *Timothy Sims*

Timothy Sims, Lindsey's younger brother by ten years, testified during the PCR hearing, but did not testify during the murder trial. Sims testified he was convicted of a drug offense in 2003, a year before the trial. He testified he received a suspended six-year sentence but was available to testify during the trial. Sims testified Lindsey was a father figure to him, and he lived with Lindsey, Victim, and their sons for a time. He said he never witnessed any physical violence between Lindsey and Victim. Sims testified that two weeks before the murder, Lindsey cried and contemplated suicide. Sims stated he had never seen Lindsey cry before. Sims detailed that the day before the shooting, Lindsey suspected Victim was seeing another man and Lindsey asked Victim over the phone to let him visit with the boys. Sims stated Victim refused to let Lindsey's children see him, and he heard one of Lindsey's sons say, "I want my daddy," but Victim stated, "no, you don't, we is not living with him no more, that's not your daddy," and hung up the phone. Sims testified he spoke to Lindsey on the phone shortly before the shooting, and Lindsey was crying about Victim's new boyfriend and stated he felt like his head was "messed up," like he was "all out of his mind." According to Sims, when Lindsey asked him to check on Victim's home, Lindsey was trying to find out if Victim was seeing another man, not to find out how his children were faring.

### 7. *Rodman Tullis*

Mr. Tullis, Lindsey's former attorney, did not testify during the trial. At the time of the PCR hearing, Mr. Tullis had been disbarred for several years. *See In re Tullis*, 375 S.C. 190, 652 S.E.2d 395 (2007). He testified during the PCR hearing that at the time of the murder, he represented Lindsey in some pending cases in general sessions court and perhaps some traffic court and family court matters. He stated he had spoken to Lindsey about handling some domestic issues (including Victim's extramarital affair), and he stated Lindsey's biggest concern was being able to see his children. He and Lindsey discussed Lindsey making an offer to pay child support in exchange for visitation, but no pleadings were filed, and he did not know whether Lindsey ever communicated the offer to Victim. Tullis testified that about an hour before the murder, Lindsey left him a voicemail in which Lindsey sounded emotional, distressed, and distraught but not angry or "manic." Tullis stated he visited Lindsey at the county detention center after Lindsey was released from the hospital after the murder. Tullis testified Lindsey's head was bleeding because he had been "bashing his head against the concrete wall" of his cell in an attempt to kill himself. Tullis testified Lindsey was put on suicide watch, lost a lot of weight, and told Tullis he wanted to die. Tullis also testified that a few weeks before the

shooting, Mother gave him Lindsey's suicide notes, and he gave the suicide notes and the voicemail recording to the public defender's office.

On cross-examination, Tullis noted Lindsey had a criminal domestic violence case pending at the time of the murder. He stated Victim denied Lindsey access to his children "some weeks before the shooting," and there was a court order directing Lindsey to have no contact with Victim. He also confirmed Lindsey was accused of domestic abuse incidents allegedly occurring in August and October of 1996, February 1999, August 2000, and December 2001, with the murder occurring in September 2002.

### 8. *Bill Burton*

Burton's trial testimony is summarized above. With limited exceptions, his PCR testimony tracked his trial testimony. He testified Mr. Bartosh was very busy and difficult to contact before the trial. He had no one-on-one discussions with Bartosh before testifying. He testified he had no legal experience but "the case was unorganized and I was very concerned about it." He testified he was more prepared to testify about Marion before his PCR testimony than he was before the penalty phase. Again, however, much of his PCR testimony tracked his trial testimony. He stated Lindsey was desperate for attention and "seemed [to be] a guy who wanted to have a family, who needed adult approval, and who didn't have it all." He said Lindsey did not do well in school, seemed to want a male figure in his life, and was "unsupervised." He testified he lost track of Lindsey when Lindsey was about nineteen. As he did during his trial testimony, he conceded on cross-examination that until the trial, he was not aware of Lindsey shooting Stanford Wilkins, dealing drugs, or having relationships with other women while he was married.

### 9. *Mrs. Burton*

She is identified in the PCR transcript as "Mrs. Burton" and in related filings as Patsy Burton, but it is clear she is Bill Burton's mother. She did not testify during trial. During the PCR hearing, she testified she loved Lindsey and would have testified during trial had she been asked. She stated she met Lindsey when he was six or seven, and she stated Lindsey was special to her son. Lindsey would come to her house "and fish and play." After Bill went to the Air Force Academy, Lindsey's brothers or cousins would bring him to the house on occasion. She testified she has gotten to know Lindsey better since he has been in the penitentiary, where she has visited him "many times." She testified she would have asked the jury to show Lindsey mercy if she had been called to testify.

During cross-examination, Mrs. Burton conceded that most of what she knew about Lindsey's family came from her son. She was not aware Lindsey was a drug dealer, she did not know his relationship with Victim or that he was involved in a shooting and criminal domestic violence incidents. She said "all I knew was that he was a happy little kid."

### 10. Vincent Bell

Vincent Bell was a paramedic who responded to the murder scene. He did not testify during trial. He testified during the PCR hearing that Lindsey stated at the scene that he shot his wife, then shot himself in the head, and wanted the paramedics to let him die. Bell also testified Lindsey told him he killed Victim because she was "fooling around" with another man. Bell testified he did not recall Lindsey saying anything about his children.

### 11. Tora Brawley

Tora Brawley, a clinical psychologist, testified during the PCR hearing, but not during trial. She was retained about a month before the murder trial and testified she "had been called in late in the game." She performed an "extended clinical interview and a battery of neuropsychological tests" and found Lindsey had neuropsychological deficits in verbal fluency, memory, and speed of mental tracking. She stated Lindsey informed her he had multiple instances of head trauma, problems in school, and had attempted suicide on four occasions. She scored Lindsey's full-scale IQ at 85. She testified she had no medical records, school records, or any other records pertaining to Lindsey. She testified her diagnosis was consistent with Dr. Melikian's. She gave a verbal report to Mr. Bartosh and a written report to Dr. Melikian and testified she did not know why she was not called to testify during trial. Dr. Brawley testified she performed several malingering tests which led her to conclude Lindsey was not malingering.

During cross-examination, Dr. Brawley noted she asked Lindsey about Jimmy and Lindsey told her Jimmy was like an older role model who came to live with him after Lindsey tried to commit suicide when he was twelve. She shared that information with Dr. Melikian. She testified Lindsey told her he was hospitalized for over a month after the suicide attempt and also tried to kill himself in 2001 and August 2002, weeks before he murdered Victim.

### 12. Jan Vogelsang

Jan Vogelsang, an expert in clinical social work with expertise in bio-psychosocial assessments, testified during the PCR hearing that she conducted

a bio-psychosocial assessment on Lindsey and his family. According to Vogelsang, a bio-psychosocial assessment is a gathering of extensive information in an effort to shed light on a person's behavior and determine how the person came to be in his current circumstances. Vogelsang interviewed Lindsey, his family, Topp, Tullis, Dr. Melikian, and Dr. Brawley; reviewed Lindsey's medical records, mental health records, prison records, suicide notes, legal/criminal records, and a letter he wrote to Victim's mother; reviewed the medical, mental health, and criminal records of Mother and other various family members; and visited the community where Lindsey grew up. Vogelsang explained Lindsey grew up in "abject poverty,"[3] and his family had a history of sexually inappropriate behavior, abandonment and desertion of children, drug dealing, domestic and non-domestic violence, imprisonment, untreated mental illnesses and suicide attempts, a lack of education, and a belief in and use of "roots."[4] Vogelsang stated Lindsey's childhood home was a crowded four-bedroom home (it was actually a two-bedroom home with four rooms) with as many as ten people living together, with no indoor plumbing or heating, and was located in a rough neighborhood where drug-dealing was prevalent.

Vogelsang testified Lindsey was abandoned by his father, and Mother was not involved in important parts of his life, causing him to have an over-reactivity to rejection. She testified Lindsey did not have a strong adult male figure in his life, and one of the biggest risk factors for criminal activity and incarceration in a young male is the absence of a strong male figure in the young male's life. Vogelsang also testified Lindsey was corrupted or mis-socialized by watching his family's violent behavior, specifically by witnessing the males in his life beat their girlfriends and get into fights and witnessing Mother shoot at her boyfriend. In addition, Lindsey's uncles used him as a drug runner beginning at age twelve or fourteen. Vogelsang also testified Lindsey thought he was a good and loving father to his children. Vogelsang testified there was no evidence Lindsey abused his children. Vogelsang opined the family system and behaviors witnessed by Lindsey through his

---

[3] Vogelsang explained "abject poverty" means Lindsey's family "did go cold, did go hungry, that the children got up in the morning early to see who could be first to get one of [the family's three spoons] and eat first."

[4] Vogelsang testified "roots" is a cultural practice using liquids, powders, and plants to affect others' lives and is a form of voodoo or black magic. Vogelsang explained children who grow up in violent or chaotic homes that practice roots "are simply further confused by the use of roots, and especially if it's being used to deal with problems in relationships."

developing years caused an accumulation of risk factors affecting his decision-making, judgment, insight, and impulsivity and placed him at a higher risk of committing a "serious act."

On cross-examination, Vogelsang testified she also had experience as a social worker in family court child custody cases. She testified she was not aware Lindsey had given one of his infant children beer in a baby bottle, but she conceded that would be something she would weigh against a parent having unsupervised visitation rights, as would dealing drugs, carrying a firearm, being violent toward the children's mother, and shooting someone (all of which applied to Lindsey before he murdered Victim). During cross-examination, Vogelsang also admitted Lindsey's belief he was a good father was based on his limited understanding of what fatherhood was, namely buying things for his children. She admitted that because of Lindsey's criminal history and abuse of Victim, she would have been hesitant to recommend to a family court judge that Lindsey have visitation rights, even with supervision. She also conceded on cross that Lindsey's uncle Steve Pilgrim was a father figure to Lindsey, spent time with Lindsey, and Lindsey liked being with him (though in Vogelsang's opinion, Pilgrim did not have "the skills" necessary to help Lindsey through "developmental stages"). She also confirmed on cross she had not spoken with eight other potential witnesses identified to her.

### 13. Dr. Melikian

Dr. Melikian, the forensic psychiatrist who testified for Lindsey during the penalty phase, also testified during the PCR hearing. She testified Lindsey's case was either her first or second death penalty case. She testified she was unable to fully prepare for trial because Mr. Bartosh contacted her only a month or so before trial. She testified the mitigation investigation was lacking, and she testified she was inexperienced in death penalty cases at the time of trial. Dr. Melikian testified she had six to seven times more records and information for the PCR hearing than she had at the time of trial, and she noted some of the new records (Lindsey's suicide notes, some mental health and medical records, some prison records, and parts of the incident reports related to the shooting) might have impacted her view of the case. Dr. Melikian also testified she did not know Lindsey's family history at the time of trial or the extent to which he was suicidal at the time of the shooting. Dr. Melikian asserted this additional information "would have changed" her diagnosis because she did not "understand the seriousness of Mr. Lindsey's depression at the time of the incident."

Dr. Melikian testified Mr. Bartosh set up a time for her to call the trial judge so she could explain she was not ready to testify. Bartosh did not participate in this

phone call and did not, to her knowledge, formally request a continuance. Dr. Melikian testified that even though she would have still diagnosed Lindsey with depression, the information she obtained after trial and before her PCR testimony would have allowed her to better understand and testify during trial about the depth of Lindsey's depression and explain to the jury the depression could have been the cause of his low cognitive ability at the time of the shooting.

Dr. Melikian also testified about Jimmy, Lindsey's alleged imaginary friend. She testified that at the time of trial, she believed Jimmy was merely a coping mechanism when Lindsey was under stress. She testified that had she known before trial that Lindsey apparently fabricated Jimmy, she would have made the fabrication the focus of her evaluation before trial because it might have provided evidence helpful to a mental health defense. However, on cross-examination, Dr. Melikian conceded she had learned since the trial that Lindsey invented Jimmy on the advice of fellow inmates, not for any reason related to his deficient mental status.

### 14. James Evans Aiken

Lindsey contends trial counsel was ineffective in failing to retain a prison adaptability expert to testify during trial. James Evans Aiken,[5] a prison adaptability expert, testified during the PCR hearing that he reviewed Lindsey's prior records from SCDC up until the 2004 trial and determined SCDC "has and can manage this type of offender for the remainder of his life without causing unreasonable risk of harm to staff, inmates, as well as the general community." However, on cross-examination, Aiken admitted the "best predictor of future behavior is past behavior," and he acknowledged Lindsey was previously convicted of ABWIK for shooting an ex-girlfriend's new boyfriend through the windshield of the man's vehicle and had been charged with criminal domestic violence several times. Aiken also admitted Lindsey got into multiple fights with other inmates while he was in prison, had been in an altercation with an officer who tried to break up one of the fights, and had been "gassed" by an officer who was attempting to break up a fight in which Lindsey was involved.

### B.

The PCR court ruled trial counsel's investigation of the social history of Lindsey and his family members was reasonable. Pointing to the trial testimony of Mother, Chris Wilkins, Bill Burton, Leon McDowell, and Steve Pilgrim, the PCR

---

[5] Mr. Aiken introduced himself to the jury as James Evans Aiken, but the transcript header refers to him as Rob Aiken.

court concluded that even though the investigation did not meet the ABA Guidelines, the investigation "uncovered matters necessary for the defense." The PCR court concluded the summaries of Lenora Topp's interviews of Lindsey and Mother, and Topp's PCR testimony about what Topp learned in 2004 are in virtually the same detail as the PCR testimony of Jan Vogelsang and Lindsey's family members. The PCR court explained that Jan Vogelsang's testimony, while "laborious," conveyed essentially the same information presented to the trial jury. The court also cited some less-than-helpful information imparted by Vogelsang, including her concession that she would not have recommended Lindsey have even supervised visitation with his children, in light of Lindsey's proclivity to deal drugs and act violently. The PCR court also noted that even though Vogelsang "presented a social history of known poverty and lack of a father figure . . . , she also confirmed that he had become a controlling and violent person."

The PCR court also ruled trial counsel's failure to call paramedic Vincent Bell as a witness was not deficient performance. The PCR court ruled the same information provided by Bell during the PCR hearing was conveyed to the jury by other witnesses.

## V. PCR Court's Signing of the State's Proposed Orders

After the PCR hearing, the PCR court requested the parties to submit proposed orders. The PCR court signed the proposed order submitted by the State, making no changes or corrections. As noted, the PCR court dismissed Lindsey's PCR claim, finding, among other things, that Lindsey's three trial attorneys were not deficient in investigating or presenting his mitigation defense, and, even if they were deficient, Lindsey was not prejudiced.

The PCR court denied Lindsey's motion to reconsider. Lindsey petitioned this Court for a writ of certiorari, arguing the PCR court's verbatim adoption of the State's proposed order violated his constitutional rights, and noting the order contained numerous typographical and grammatical errors, which Lindsey asserted cast doubt as to whether the PCR court even read the proposed order before signing it. We vacated the dismissal of Lindsey's application for PCR and remanded the case to the PCR court to issue a new order that (1) included findings of facts and conclusions of law on each issue presented in Lindsey's PCR application with accurate references to the record and applicable law and (2) complied with *Pruitt*; *Hall*; and section 17-27-80.

On remand, the PCR court asked the parties for the same proposed orders they previously submitted. In response, Lindsey filed a petition for extraordinary relief

to this Court, asking for a new PCR hearing before a different judge and asserting the PCR court had violated this Court's order by requesting copies of the original proposed orders, which indicated it planned to adopt the State's order a second time. We denied the request for extraordinary relief.

Subsequently, the PCR court issued an amended order, again denying Lindsey PCR. The PCR court initialed each page of the 187-page order and made three handwritten and initialed edits to typographical errors in the amended order. Lindsey filed another petition for extraordinary relief, alleging the amended order was the same as the original PCR order except for the correction of some typographical errors. We denied that petition as well.

Lindsey moved in the circuit court for a new PCR hearing in front of a new PCR judge or, in the alternative, for reconsideration of the amended order of dismissal. During the hearing of this motion, the PCR judge admitted he read through the parties' proposed orders the first time "probably too hastily and [] didn't make any corrections because of that." However, the judge noted the State's order "was exactly as I . . . saw the case that was presented to me." The PCR court explained during a post-remand hearing:

> [Y]'all would never even imagine the number of hours that [my law clerk] and I spent going through all these documents. And even after we loaded the final proposed order that, I even instructed [my law clerk] to not make some corrections on purpose to prove to everyone that could possibly be concerned on this case that I was involved in redrafting that order and there were many changes made. As I said, I purposely asked him to leave some errors in there so I could initial them to prove that point, and I even took the extra step to call the Clerk of the Supreme Court to let them know over there that I had purposely done that to prove what I'm just stating. So I wanted to put that on the record because I didn't want anybody to say well, [the PCR court] didn't even correct this last order. That was purposefully done.

The PCR court then denied Lindsey's recusal motion. After a second hearing on the motion to reconsider, the PCR court denied the motion.

## VI. Discussion

### A.

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components."

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). "First, the defendant must show that counsel's performance was deficient." *Id.* "Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* "When a defendant challenges a death sentence, prejudice is established when 'there is a reasonable probability that, absent [counsel's] errors, the sentencer–including an appellate court, to the extent it independently reweighs the evidence–would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Council v. State*, 380 S.C. 159, 176, 670 S.E.2d 356, 365 (2008) (quoting *Jones v. State*, 332 S.C. 329, 333, 504 S.E.2d 822, 823 (1998)). "The bottom line is that we must determine whether or not [the defendant] has met his burden of showing that it is reasonably likely that the jury's death sentence would have been different if counsel had presented additional" mitigating evidence. *Jones*, 332 S.C. at 333, 504 S.E.2d at 824. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687.

Generally, "[o]ur standard of review in PCR cases depends on the specific issue before us." *Smalls v. State*, 422 S.C. 174, 180, 810 S.E.2d 836, 839 (2018). "We defer to a PCR court's findings of fact and will uphold them if there is evidence in the record to support them." *Id.* (citing *Sellner v. State*, 416 S.C. 606, 610, 787 S.E.2d 525, 527 (2016)). "We review questions of law de novo, with no deference to trial courts." *Id.* at 180-81, 810 S.E.2d at 839. Whether trial counsel was deficient and whether any deficiency prejudiced a PCR applicant are questions of law.

**B.**

We first address Lindsey's argument that the PCR court violated our Remand Order and violated his constitutional and statutory rights by readopting the State's proposed order of dismissal after this Court's remand, asserting the PCR court did so without considering Lindsey's grounds for PCR or even reading the proposed order before signing it. Lindsey contends this Court, by citing *Pruitt* and *Hall* in the Remand Order, required the PCR court to draft its own order. Lindsey argues the PCR court ignored this directive by adopting the State's proposed order a second time without making any material changes to the order or even correcting a majority of the typographical errors. Lindsey requests de novo review of the factual findings of the PCR court or, in the alternative, a new PCR hearing.

Lindsey argues for de novo review, claiming the PCR court adopted the State's proposed order without reading it, which removes the "presumption of correctness"

of the order. Lindsey cites federal habeas corpus cases he contends support this argument. *See Jefferson v. GDCP Warden*, 941 F.3d 452, 474 (11th Cir. 2019) (finding "the state habeas court's factual findings [were not] entitled to a presumption of correctness" because the state court deprived the defendant of a "full and fair hearing" by adopting an order "drafted exclusively by the State pursuant to an ex parte request made by [the judge's] law clerk," and the order showed the court "uncritically accepted findings prepared without judicial guidance" as shown by the court overlooking at least twenty-one typographical errors, inviting the inference that the court "failed to review the proposed order . . . before executing the final order").

A PCR court "shall make specific findings of fact, and state expressly its conclusions of law, relating to each issue presented." S.C. Code Ann. § 17-27-80. The commentary to Canon 3B(7) of the Code of Judicial Conduct states a court "may request a party to submit proposed findings of fact and conclusions of law, so long as the other parties are apprised of the request and are given an opportunity to respond to the proposed findings and conclusions." *See* Commentary to Rule 3B(7), CJC, Rule 501, SCACR.

We have expressed a "concern with the increasing number of orders in PCR proceedings that fail to address the merits of the issues raised by the applicant" because this "deprive[s] the parties of rulings on the issues raised, [and] makes review by the appellate court more difficult and ultimately increases the work load of all involved[,]" often requiring a new hearing. *Pruitt*, 310 S.C. at 255-56, 423 S.E.2d at 128. In *Pruitt*, we stated, "Counsel preparing proposed orders should be meticulous in doing so, opposing counsel should call any omissions to the attention of the PCR judge prior to issuance of the order, and the PCR judge should carefully review the order prior to signing it." *Id.* at 256, 423 S.E.2d at 128. Also, while we "strongly encourage[d] PCR judges to draft their own findings of fact and conclusions of law in death penalty cases, we also acknowledge[d] that in all other cases, it is common practice for judges to ask a party to draft a proposed order for the sake of efficiency." *Hall*, 360 S.C. at 365, 601 S.E.2d at 341.

We hold the PCR court did not err in requesting proposed orders from the parties after remand or in adopting the State's proposed order. PCR courts can, and commonly do, request and adopt proposed orders from parties, even though PCR courts are encouraged to write their own orders in death penalty PCR cases. *See* § 17-27-80; Commentary to Rule 3B(7), CJC, Rule 501, SCACR; *Hall*, 360 S.C. at 365, 601 S.E.2d at 341. This practice is proper, as long as: (1) the other parties are aware of the request for a proposed order and are allowed to respond to the proposed order; and (2) the PCR court carefully reviews the order before signing it. *Hall*, 360

S.C. at 365, 601 S.E.2d at 341; *Pruitt*, 310 S.C. at 255-56, 423 S.E.2d at 128. Here, the record shows that (1) after the initial PCR hearing, the PCR court requested a proposed order from the State in a letter sent to the State and copied to Lindsey's PCR counsel on May 2, 2011; (2) in a May 12, 2011 email to Lindsey's PCR counsel and copied to the State, the PCR court apologized for not requesting a proposed order from Lindsey, noting it had mistakenly believed Lindsey had already sent in a proposed order and stating it would hold the matter open for Lindsey to have time to submit a proposed order, which he did; (3) the State sent its proposed order to the PCR court and Lindsey on June 2, 2011, providing Lindsey with time to respond to the proposed order, which he did not; and (4) after this Court remanded the case to the PCR court for a new order, the PCR court emailed both parties asking the parties to send their initial proposed orders, not new orders, and in response, Lindsey filed a petition for emergency relief to this Court, which was denied. Thus, we believe Lindsey was aware of and had ample opportunity to respond to the State's proposed order.

The PCR court's post-remand statements at the hearing on Lindsey's motion to reconsider establish the PCR court sufficiently reviewed the State's proposed order before issuing the amended PCR order. Specifically, the PCR court stated: (1) the State's order "was exactly as I . . . saw the case that was presented to me"; (2) the parties "would never imagine the number of hours" the PCR court spent working on the case; and (3) the PCR court purposefully left in errors so it could fix and initial the errors to prove it read the order. *See Hall*, 360 S.C. at 357, 365, 601 S.E.2d at 337, 341 (finding the PCR court "spent an adequate amount of time reviewing the [PCR] order before adopting it," where the PCR court adopted the State's proposed order "in full, without alterations" in a death penalty case but told the parties it would "carefully review the proposed order and insure that the facts and conclusions of law are as I find them to be"). Thus, the record demonstrates the PCR court adopted the State's proposed order only after carefully reviewing the State's initial proposed order. Therefore, we hold the PCR court did not adopt the amended order in violation of Lindsey's constitutional rights or South Carolina law.

Next, we address Lindsey's assertion that the amended PCR order violates our Remand Order because it does not contain specific findings of fact or conclusions of law with respect to each of his PCR claims. In Lindsey's post-PCR hearing memorandum, he listed each of his PCR claims, including his claims trial counsel was ineffective for failing to: (1) prepare Lindsey for his mental-health evaluations, spend enough time with him, and stop Lindsey from listening to "jailhouse lawyers" telling him to feign a mental illness; (2) adequately address the issue of malingering; (3) adequately prepare witnesses to request mercy for Lindsey or adequately defend

the witnesses' right to request mercy for Lindsey during their trial testimony; (4) provide sufficient information to Dr. Melikian to allow her to both properly evaluate and testify regarding Lindsey's mental condition; (5) adequately present Lindsey's family history of mental illness and impairment; (6) present evidence of Lindsey's adaptability to prison through an expert; (7) present an expert to discuss Lindsey's psycho-social history; (8) present EMS workers who treated Lindsey at the scene of the murder and said Lindsey said he shot himself and wanted to die; (9) "commit sufficient time to perform an adequate investigat[ion] for the penalty phase of the trial . . . [or] adequately prepare for the presentation of a case in support of mitigation"; and (10) argue against the aggravating factor raised by the State. In its amended order, the PCR court addressed each of these issues, evaluating the facts extensively and reaching legal conclusions as to each. Thus, we hold the PCR court articulated specific findings of fact and conclusions of law as to each issue raised by Lindsey, as required by our remand order and as required by *Pruitt*, *Hall*, and section 17-27-80. We hold the order comports with South Carolina law and our Remand Order. Accordingly, we will adhere to our normal standard of review. *See Smalls*, 422 S.C. at 180-81, 810 S.E.2d at 839 ("We defer to a PCR court's findings of fact and will uphold them if there is evidence in the record to support them," but "we review questions of law de novo, with no deference to trial courts").

We respectfully reject Lindsey's arguments and will defer to the PCR court's factual findings if they have evidentiary support. We also hold there is no justification for a new PCR hearing.

### C. Lindsey's Ineffective Assistance Claims

Lindsey intersperses in his mitigation argument many allegations relative to the *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (*ABA Guidelines*). Lindsey asserts trial counsel was deficient in failing to follow the *ABA Guidelines* in the following particulars: (1) failing to obtain records concerning Lindsey's background or his family members who had mental illnesses; (2) not beginning the mitigation investigation until a month before trial; (3) failing to present evidence of Lindsey's "horrible childhood"; (4) failing to attend important interviews with the State's mental health expert; (5) losing the tape of Lindsey's voicemail to Tullis; (6) failing to call important mitigation witnesses, such as the paramedics who treated Lindsey at the scene of the incident, Lindsey's childhood doctor, and Sims, Lindsey's younger brother; (7) failing to prepare the mitigation witnesses to ask the jury for mercy for Lindsey; (8) failing to retain, prepare, and call Dr. Brawley, who tested Lindsey for cognitive impairments; (9) failing to retain a social work expert; and (10) failing to retain a prison adaptability expert to testify during trial. Lindsey also contends the

PCR court erred in failing to rely upon the *ABA Guidelines* in determining whether trial counsel was deficient.

This Court has noted the *ABA Guidelines* in a PCR case are but one factor in determining whether trial counsel's performance in a death penalty case was deficient. *Council*, 380 S.C. at 172-73, 670 S.E.2d at 363. The *ABA Guidelines* purport to "set forth a national standard of practice for the defense of capital cases in order to ensure high quality legal representation for all persons facing the possible imposition or execution of a death sentence by any jurisdiction." *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* 1.1(A) (rev. 2003). "As soon as possible after designation, lead counsel should assemble a defense team," including "at least one mitigation specialist and one fact investigator" and "one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments." *ABA Guidelines* 10.4(C). "Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." *ABA Guidelines* 10.7(A).

> In deciding which witnesses and evidence to prepare concerning penalty, the areas counsel should consider include the following: 1. Witnesses familiar with and evidence relating to the client's life and development . . . that would be explanatory of the offense(s) . . . or would otherwise support a sentence less than death; 2. Expert and lay witnesses along with supporting documentation (e.g., school records, military records) to provide medical, psychological, sociological, cultural or other insights into the client's mental health and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offense(s); to give a favorable opinion as to the client's capacity for rehabilitation, or adaption to prison; to explain possible treatment programs; or otherwise support a sentence less than death; and/or to rebut or explain evidence presented by the prosecutor . . . .

*ABA Guidelines* 10.11(F).

As we noted in *Stone v. State*, 419 S.C. 370, 397 n.6, 798 S.E.2d 561, 576 n.6 (2017), the United States Supreme Court and this Court "have relied on the ABA Guidelines to determine whether counsel's performance was reasonable" under the *Strickland* deficiency prong. *See also Ard v. Catoe*, 372 S.C. 318, 332, 642 S.E.2d 590, 597 (2007). In *Bobby v. Van Hook*, the United States Supreme Court flatly

rejected the notion that the 2003 ABA Guidelines should be considered "inexorable commands" trial counsel must strictly follow:

> *Strickland* stressed, however, that "American Bar Association standards and the like" are "only guides" to what reasonableness means, not its definition. 466 U.S., at 688, 104 S.Ct. 2052. We have since regarded them as such. See *Wiggins v. Smith,* 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). What we have said of state requirements is *a fortiori* true of standards set by private organizations: "[W]hile States are free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented, we have held that the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Roe v. Flores-Ortega,* 528 U.S. 470, 479, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000).

558 U.S. 4, 8-9 (2009) (footnote omitted).

Lindsey's initial specific mitigation-related claim is that trial counsel waited too late to mount a pretrial mitigation effort. We disagree. In *Bobby*, the defendant's trial counsel met with one mitigation expert for the first time one month before trial and met with another for two hours one week before trial. *Id.* at 9-10. The Court found the timing of the retention of experts to be reasonable and rejected the lower court's holding that counsel waited until the last minute. Under the facts of this case, we hold the timing of the retention of Lindsey's experts was not unreasonable.

Lindsey contends trial counsel was deficient in failing to perform an adequate mitigation investigation; in failing to hire a social work expert to testify as to his poor upbringing; and in failing to prepare Dr. Melikian for her testimony. Lindsey claims that had trial counsel performed according to accepted professional norms, it is reasonably likely the jury would not have recommended a death sentence. Lindsey argues he is entitled to a new sentencing trial because the mitigation evidence he presented during the PCR hearing was far from being merely cumulative to what he describes as trial counsel's "feeble" mitigation presentation.

Even if trial counsel's investigation and presentation of evidence was deficient, we hold Lindsey was not prejudiced. We first address Dr. Melikian's testimony. Even though Dr. Melikian testified during the PCR hearing that she was inexperienced at the time of trial and felt she did not have enough time to prepare for her penalty phase testimony, she very clearly and ably testified during the penalty phase that Lindsey had major depressive disorder at the time of the murder, had limited coping abilities at the time of the murder arising from his low intelligence

and his cognitive deficits, and was not malingering. While Dr. Melikian testified during the PCR hearing that having additional records and information regarding Lindsey would have changed her understanding of the depth of Lindsey's depression, her trial testimony that Lindsey suffered from major depressive disorder at the time of the murder and was not malingering remained the same. It is apparent from Dr. Melikian's testimony as a whole that any lack of experience and other supposed shortcomings in available information did not hamper her ability to effectively provide relevant opinions during the penalty phase.

Lindsey claims the State's cross-examination of Dr. Melikian about Jimmy was particularly devastating. Dr. Melikian stated during her PCR testimony that had she known before trial Lindsey "was malingering Jimmy," she could have tailored her testimony to explain "that with his level of depression and cognitive ability, he's believing [making up Jimmy] is a good idea." However, as we read Dr. Melikian's trial testimony, that is essentially what she did during her trial testimony. As summarized above, Dr. Melikian's trial testimony reveals that in the face of the State's cross-examination, she held fast to her opinion Lindsey was not malingering, and she expressed her frank disagreement with Dr. Narayan's assessment of malingering. Specifically, she insisted during cross-examination that Lindsey's report of an imaginary friend named Jimmy had nothing to do with her diagnosis of mental illness, stating "[h]e is suffering from depression regardless of whether he had the hallucination of the imaginary friend or not. I'm not sure that that would change, it would not change his neurological impairment or his low IQ."

Lindsey, not trial counsel or Dr. Melikian, fabricated Jimmy. Even if Dr. Melikian had known of the fabrication before her trial testimony, she would have still been cross-examined about the fabrication as it related to Lindsey's attempt to avoid responsibility for his actions. As noted above, she explained during her trial testimony why the fabrication did not impact her opinion Lindsey suffered from cognitive deficits, depression, and neurological deficits. And as also noted above, under cross-examination during the PCR hearing, Dr. Melikian admitted it appeared Lindsey fabricated Jimmy at the behest of his fellow jail inmates, not as a result of his mental health deficiencies. All in all, the damage to Lindsey's mitigation defense resulted from Lindsey's choice to fabricate Jimmy, not from Dr. Melikian's lack of knowledge or supposed unpreparedness.

Vogelsang's PCR testimony, considered in isolation or in conjunction with other evidence, does not establish Lindsey suffered prejudice from any supposed deficiency on the part of trial counsel. While Vogelsang's PCR testimony was certainly detailed, and while she talked to more people and considered more documentation than what was alluded to during trial, she provided information of

the same substance as did Dr. Melikian and others during the penalty phase. The substance of Vogelsang's bio-psychosocial assessment contained much of the same evidence that was presented to the jury during the penalty phase: Lindsey grew up in extreme poverty. He was abandoned by his father, and his mother was not involved in important parts of his life. Lindsey felt rejected and suffered from major depression. Other family members suffered from mental illness. He ingested kerosene and his head was run over by a car when he was a very small child. He had cognitive deficits and did poorly in school. An uncle threw Lindsey's kitten to its death into a fire. Lindsey attempted suicide at age fifteen. Vogelsang provided additional details during the PCR hearing, such as Lindsey witnessing his mother shoot at her boyfriend; witnessing family members deal drugs; witnessing males in his family beat their girlfriends; and family members believing in the use of "roots." However, these additional details fall far short of establishing a reasonable probability that, had they been related to the jury, the jury would have recommended a sentence other than death.

Lindsey claims the penalty phase mitigation evidence that was communicated to the jury was communicated ineffectively. We disagree. Mother testified during the penalty phase that Lindsey attempted suicide at age fifteen, ingested kerosene and was run over by a car as a baby, and that Lindsey's father was not involved in his life. She also testified Lindsey was depressed during the weeks leading up to the murder, and Burton, Lindsey's friend and mentor, testified Lindsey grew up in "desperate poverty" "without the benefit of parents like normal families." Uncle Steve Pilgrim testified Lindsey was run over as a baby, and he testified about his own mental health issues and his daughter's mental health issues. Aunt Bessie Smith testified that when Lindsey was a child, he witnessed his uncles throw his kitten into a heater.

We further hold that had Timothy Sims and Rodman Tullis testified during the penalty phase, there is not a reasonable probability the jury would have recommended a sentence other than death. Sims' testimony was essentially the same as that given by other family members. Tullis's testimony adds little to the mitigation case, and if he had testified during trial, he could have been effectively cross-examined on the nature of his legal representation of Lindsey (drug offenses, family court order of protection, and domestic abuse charges). That is true even though the jury heard evidence of these misdeeds during the penalty phase. As for Tullis's testimony that Lindsey sounded very depressed in his voicemail, Dr. Melikian testified Lindsey was depressed and suicidal at the time of the murder. Also, Ann Howard testified Lindsey was suicidal, and Mother testified Lindsey was very

depressed.  Finally, the evidence presented to the jury that Lindsey shot himself immediately after murdering Victim is certainly evidence of his suicidal intent.

Lindsey claims he was prejudiced by trial counsel's failure to prepare his mitigation witnesses to ask the jury for mercy.  We reject this claim, as Lindsey's mother, father, and Chris Wilkins (who is "like a brother" to Lindsey), asked the jury to show mercy and not sentence Lindsey to death.  There is no prejudice when pleas for mercy would be cumulative.  *See State v. Sapp*, 366 S.C. 283, 294, 621 S.E.2d 883, 888 (2005).

Lindsey next argues the PCR court erred in denying his claim that trial counsel was ineffective for failing to call EMS worker Vincent Bell to testify.  Bell responded to the scene of the murder and testified during the PCR hearing that Lindsey told him he shot his wife and wanted to die.  EMS worker Joseph Stewart testified for the defense during the guilt phase.  He testified he treated Lindsey at the scene for multiple gunshot wounds, including one to the head.  Stewart told the jury Lindsey stated he shot himself in the head after he shot Victim.  Even though the jury did not hear Bell's testimony that Lindsey said he wanted to die, Lindsey's statement to Stewart that he shot himself after shooting Victim was a clear indication to the jury that Lindsey wanted to die.  Also, Bell testified during the PCR hearing that Lindsey said he shot Victim because she "was fooling around" with another man.  This testimony directly contradicted one of Lindsey's central claims—that he shot Victim because he was depressed over Victim not letting him visit his sons.  Bell's testimony, if presented to the jury, would have painted Lindsey as an angry and jealous husband, not as a desperate and depressed father distraught over not being able to visit his children.

Lindsey also argues the PCR court erred in rejecting his claim that trial counsel provided ineffective assistance of counsel by failing to hire a prison adaptability expert to testify Lindsey "did not pose an unreasonable risk of harm to prison staff, other inmates, or the community."  As noted above, prison adaptability expert Aiken testified during the PCR hearing.  Lindsey contends the PCR court erred in: (1) disregarding Aiken's testimony that Lindsey could adapt to prison life and that SCDC could manage Lindsey; and (2) speculating that Lindsey's trial counsel considered and had a reasonable trial strategy for not presenting a prison adaptability expert during trial, when no valid reason existed not to call a prison adaptability expert.  Specifically, Lindsey asserts the only valid reason not to call such an expert would be if no expert would testify Lindsey could adapt to prison life.  Lindsey further notes the PCR court speculated trial counsel did not procure testimony from a prison adaptability expert in an effort to keep Lindsey's prison altercations from being introduced during the penalty phase.  Lindsey asserts the

State introduced this evidence anyway, and no expert testimony was offered to rebut the State's contention that Lindsey could not adapt to prison life. Lindsey asserts trial counsel's failure to present testimony from a prison adaptability expert prejudiced him because there was a reasonable probability that if the jury had heard he was adaptable to prison, the jury would not have recommended a death sentence, especially considering the "only" reason Lindsey's case was a death penalty case was because he killed Victim in a public place instead of a private one, "transforming a domestic homicide into a capital crime."

"In deciding which witnesses and evidence to prepare concerning [the] penalty [phase of a capital murder trial], . . . the areas counsel should consider include . . . [e]xpert and lay witnesses . . . to give a favorable opinion as to the client's capacity for rehabilitation, or adaptation to prison . . . ." *ABA Guidelines* 10.11(F). Our courts are not required to blindly adhere to the *ABA Guidelines*; however, the United States Supreme Court has held adaptability to prison life is constitutionally relevant. *Skipper v. South Carolina*, 476 U.S. 1, 8 (1986), *as recognized by Chaffee v. State*, 294 S.C. 88, 91, 362 S.E.2d 875, 877 (1987).

We conclude the PCR court did not err in finding trial counsel did not provide ineffective assistance of counsel by failing to call a prison adaptability expert, but for a different reason than that expressed by the PCR court. The PCR court found Mr. Bartosh exercised "reasonable professional judgment" in not calling a prison adaptability expert, concluding testimony from an expert such as Aiken would have been unpersuasive, given Lindsey's history of fights in prison. However, this was error, because there is no evidence as to why Mr. Bartosh did not retain or call a prison adaptability expert to testify. We have held that neither the PCR court nor the appellate court can conclude trial counsel exercised a valid trial strategy unless evidence is presented as to what the strategy actually was. *See, e.g.*, *Weik v. State*, 409 S.C. 214, 236, 761 S.E.2d 757, 768 (2014); *Smith v. State*, 386 S.C. 562, 568, 689 S.E.2d 629, 633 (2010); *Gilchrist v. State*, 350 S.C. 221, 228 n.2, 565 S.E.2d 281, 285 n.2 (2002); *Bruno v. State*, 347 S.C. 446, 451, 556 S.E.2d 393, 395-96 (2001).

However, even if trial counsel was deficient in failing to present testimony from a prison adaptability expert, Lindsey was not prejudiced by this deficiency. As noted above, adaptability expert Mr. Aiken testified during the PCR hearing that he reviewed Lindsey's prior records from SCDC up until the 2004 trial. He testified SCDC "can manage this type of offender for the remainder of his life without causing unreasonable risk of harm to staff, inmates, as well as the general community." However, on cross-examination, Aiken admitted the "best predictor of future

behavior is past behavior," and he acknowledged Lindsey's prior conviction for ABWIK after shooting Stanford Wilkins. Aiken also acknowledged Lindsey had been charged with domestic violence several times. Aiken's testimony that SCDC could suitably manage Lindsey was also significantly neutered by evidence of Lindsey's prison fights, that a prison guard had been caught in the middle of one of the fights, and that Lindsey was gassed in order to break up one of the fights. Lindsey's commission of violent crimes and his violent conduct in prison severely contradicted Aiken's adaptability opinion and would have done so had he testified during the penalty phase. Because Lindsey did not establish prejudice, he is not entitled to relief on this ground.

## VII. Conclusion

We hold the PCR court did not err in signing the amended PCR order. We also hold any deficiencies in trial counsel's investigation and presentation of a mitigation defense did not prejudice Lindsey. Even if trial counsel had secured a more robust mitigation investigation, and even if trial counsel had presented the mitigation evidence Lindsey presented during the PCR hearing, it is not reasonably likely the jury would have recommended a sentence other than death. *See Jones*, 332 S.C. at 338-39, 504 S.E.2d at 826 (holding the absence of "fancier" mitigation evidence does not render the prior mitigation case constitutionally inadequate where such evidence would not have any effect on the outcome of the trial). Lindsey has not made the requisite showing that trial counsel's errors, if any, were so serious so as to deprive him of a trial whose result was reliable. *See Strickland*, 466 U.S. at 687. Lindsey has not established "'there is a reasonable probability that, absent [counsel's] errors, the sentencer–including an appellate court, to the extent it independently reweighs the evidence–would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Council*, 380 S.C. at 176, 670 S.E.2d at 365 (quoting *Jones*, 332 S.C. at 333, 504 S.E.2d at 823). The decision of the PCR court is therefore

**AFFIRMED IN RESULT.**

**KITTREDGE, C.J., and Acting Justice Paula H. Thomas, concur. HILL, J., concurring in part and dissenting in part in a separate opinion, in which Acting Justice Donald W. Beatty, concurs.**

**JUSTICE HILL, concurring in part and dissenting in part:**

I join Section VI.B of the majority opinion affirming that there was no error in the procedural aspects of the trial court's signing of the order. With great respect, I dissent from the majority's conclusion that Lindsey received the effective assistance of counsel at the sentencing phase of his death penalty trial.

## I. Trial Preparation

Lindsey was indicted and served with the State's death penalty notice in October 2002. It appears Mr. Bartosh became Lindsey's counsel that same month. The trial began on May 17, 2004.

As lead trial counsel, Mr. Bartosh began to assemble his team two months before trial. Second chair counsel was not appointed until March 5, 2004. The second chair counsel was just three years out of law school and had never tried a capital case. Trial counsel did not engage a mitigation investigator to gather records of Lindsey's social history until April 16, 2004. Ms. Topp, the investigator, had also never worked on a death penalty case. Trial counsel waited until April 12, 2004, to contact Dr. Tara Brawley, a neurologist. Dr. Brawley first told trial counsel she could not work on the case, but due to a cancellation, she was able to work Lindsey in for an examination on April 27, 2004. The trial was then just twenty days away. Ms. Topp scrambled to obtain Lindsey's school and medical records. She was still sending out releases to obtain some of these records after the trial had started.

Trial counsel first contacted forensic psychiatrist Margaret Melikian on April 6, 2004, but she was not retained until April 16. Dr. Melikian shared something in common with second chair counsel and Ms. Topp: like them, she had never worked on a death penalty case before. She had trouble obtaining Lindsey's records from trial counsel and did not receive anything until April 28. Her secretary noticed Lindsey had been given a competency and criminal responsibility exam after his arrest, but the report was not included in the records trial counsel sent. Dr. Melikian met with Lindsey on April 28 for an examination. Dr. Melikian soon advised trial counsel that she did not have adequate documentary evidence about Lindsey, nor the time to effectively prepare for her testimony. File notes reflect that trial counsel's response was that Dr. Melikian "knew the time constraints before she started and said she would be okay."

But it was not okay with Dr. Melikian after she realized the mitigation investigation was unorganized and incomplete. She explained to trial counsel that she felt unprepared; trial counsel told her she would have to call the trial judge, a bizarre

request to make of an expert. It appears Dr. Melikian made this call, but no formal continuance motion was ever made. The only assistance trial counsel gave Dr. Melikian with testifying in her first death penalty case (which was broadcast by CourtTV) was a thirty-minute phone conversation the night before she took the stand.

## II.     The Sentencing Phase

Because we do not have the benefit of trial counsel's version of what his mitigation strategy was, we must rely on the record. Second chair counsel testified at the PCR hearing that he was responsible only for the guilt phase, and lead trial counsel was responsible for the sentencing phase. According to second chair counsel, his defense theory during the guilt phase was that Lindsey just "snapped. That's it." But mental illness or incapacity was not a defense available to Lindsey; there was no dispute he was competent and had criminal responsibility for his actions.

To this day, we do not know what trial counsel's sentencing strategy was. We must assume it echoed the "snapping" theory. We have to assume that, because trial counsel never told the sentencing jury what the theory was. His opening statement at the sentencing phase occupies just a few pages of transcript, and he merely asked the jury to "keep an open mind," remain "objective," and to consider whether the State had met its burden of proving the aggravating circumstance beyond a reasonable doubt.

Neither trial counsel, the State, nor the trial court mentioned the word "mitigation" in their opening remarks. Trial counsel did not explain to the jury how the sentencing phase works or what the death penalty statute says about mitigating circumstances. This is a crucial point, for the jury was not told until the trial court's final charge what mitigating circumstances Lindsey was relying upon. (There were two: that "[t]he murder was committed while the defendant was under the influence of mental or emotional disturbance" and "[t]he age or mentality of the defendant at the time of the crime." S.C. Code Ann. § 16-3-20(C)(b)(2), (7) (2015)). It was only then–after they had heard all the evidence and trial counsel's closing argument–that the jurors knew the legal framework for their sentencing decision, and how mitigating circumstances fit into the framework. It is true trial counsel did tell the jury during his closing that they could "consider the mitigating circumstances. His mental state, his cognitive deficit and any other factors that you may consider appropriate." But this fleeting reference–like most of trial counsel's efforts–was so bereft of context that it must have puzzled rather than enlightened the jury. The thrust of trial counsel's closing argument was not about how the jury could use the mitigating circumstances recognized by the law and impose a sentence less than

death. Reading trial counsel's closing leads one to conclude that he tried to convince the jury that Lindsey had indeed snapped, and a life sentence for him would be a worse punishment than death.

Trial counsel presented limited evidence at the sentencing phase. This evidence consumed less than one hundred transcript pages. Eight witnesses testified, all of whom were family or friends except for Ann Howard and Dr. Melikian.

### III. The PCR Hearing Evidence

As will soon become obvious, the testimony at the PCR hearing did not just suggest trial counsel could have put on a "fancier" mitigation case. It proved that trial counsel failed to present an intelligible one. The core of death penalty mitigation is to humanize the defendant and offer evidence that would reduce his moral culpability for the horrible crime he committed. This must be done–if it is to be done competently–by presenting a coherent narrative that rational jurors can follow and understand. It requires that the story of the defendant's life be told with appropriate detail, so that jurors can be truly informed about the momentous, ultimate decision to either end or spare a fellow human's life.

Saying that the new mitigation evidence presented at the PCR hearing was simply "fancier" is the same as saying it is merely cumulative to the mitigation evidence put up at trial. A closer look at the new mitigation evidence shows that it was much different in nature and degree than what the sentencing jury heard.

Take the testimony of Lindsey's mother. At the sentencing hearing, mother testified that she raised Lindsey by herself, along with his three half-brothers. They lived in a "very small home." Mother worked, and the boys' uncle, Steve Pilgrim, would stay with them. Mother recounted how another of Lindsey's uncles backed over him with a car when Lindsey was twenty months old, injuring his head and leaving a scar. A month before, he had ingested kerosene that had been left open in a jar beside the coal heater. Mother related that Lindsey was "slow" in school and had difficulty with his speech. He repeated several grades and dropped out at age seventeen in the ninth grade.

Mother testified Lindsey and Victim's relationship was "good"; although, they often would separate and then reconcile. Mother stated Lindsey's children were the most important part of his life, in part because his father had abandoned him.

Mother told the jury that her sister, Bessie Smith, had attempted suicide. When trial counsel attempted to explore whether Bessie had been treated for a mental illness,

the State's objection was sustained for lack of foundation (when Ms. Smith later testified, the trial court sustained the State's objection to her testimony on this matter as well). Mother confirmed Lindsey was hospitalized after attempting suicide at age fifteen. When Mother saw Lindsey three days before the murder, he was "very depressed" and talked of hurting himself if he did not get to see his children and "could not get [his] family back."

At the PCR hearing, a different and decidedly bleaker picture of Lindsey's childhood emerged. Mother explained, for the first time, that until Lindsey was seven, they lived in a two-bedroom home with her mother, two or three sisters, two of her brothers (sometimes three), her other three boys, and two of her sister's children. All told, nearly a dozen people were living in a home that had no indoor plumbing or central air conditioning and was heated by a wood stove. Mother admitted she experienced emotional problems after the death of her seven-month-old daughter in 1969.

Mother's PCR testimony also revealed for the first time that for some twenty years she had a live-in boyfriend who had a severe drinking problem and often became violent in front of Lindsey and the other boys, noting Lindsey often ran to his grandmother for help. Mother further testified that her sons, Lindsey included, sometimes took "the brunt" of her boyfriend's violence. Mother noted Lindsey "just had to live with" the violence because "he didn't have too much a choice" due to his young age. The family later moved to an even rougher neighborhood, where the children were exposed to drug dealing. Mother testified that her brothers Paul and Willie fought often and "beat their girlfriends." She told of one incident when her brother ran into the home and began shooting a firearm late at night while Lindsey and others were present.

Mother also told of two other incidents when Lindsey was around six and fell and hit his head, as well as a car wreck when he was sixteen that damaged his eye and caused other injuries.

Mother also put Lindsey's suicide attempt at age fifteen in context. Mother had attempted to break up a fight between Lindsey and his older half-brother. After Lindsey held Mother down on a bed, Mother told him she would never do anything else for him and that she did not love him. Lindsey fled to the bathroom and swallowed an assortment of pain pills. He was hospitalized for several days and received inpatient psychiatric care for around two weeks.

After he left school at seventeen, Lindsey lived with a girlfriend and began selling drugs, though occasionally taking legitimate employment.

Mother explained that she met with Ms. Topp and second chair counsel only once before the trial. The interview occurred about two weeks before the trial. It lasted one hour and never delved into Lindsey's detailed family background.

At the PCR hearing, Mother, for the first time, gave concrete detail as to what occurred when she saw Lindsey three days before the murder. Mother had been called from work by her son Timothy Sims, who claimed Lindsey was about to kill himself. She and other family members went to Lindsey and calmed him down. Lindsey had prepared suicide notes for Mother and three other family members. Mother later gave these notes to Rod Tullis, Lindsey's former attorney.

Attached to this dissent is an Appendix containing a table summarizing the enormous amount of mitigation evidence revealed at the PCR hearing and comparing it to the skeleton of facts heard by the jury at the sentencing trial. I will not burden the reader by rehashing them here. But it is crucial to understand the significance of the PCR testimony of four non-family members, three of whom did not testify at the trial: Rod Tullis, Dr. Melikian, Jan Vogelsang, and Dr. Brawley.

### A. Rod Tullis

Tullis was an important witness who any reasonable lawyer would have called to testify at the penalty phase. This is so for three reasons. First, Tullis had the best contemporaneous evidence about Lindsey's state of mind at the time of the murder. He had audio proof of Lindsey's state of mind in the form of an answering machine message Lindsey had left him shortly before the shooting. Tullis also had the suicide notes Lindsey had written his family members. The jury never heard about the message or the notes. And Tullis saw Lindsey in jail shortly after the murder. Second, Tullis could have related to the jury how concerned Lindsey was about losing custody of and contact with his children. Tullis could have testified that Lindsey consulted with him about his legal options as a father. This is a key point, for at the sentencing hearing the State again and again argued Lindsey had no concern for his children, and his disregard was proven by his failure to seek legal assistance in obtaining custody or visitation.

Third, and finally, Tullis saw Lindsey in jail a few days after the murder and observed injuries to Lindsey's head from bashing it against his cell wall in an attempt to kill himself, another detail that would have countered the State's suggestion that Lindsey's depression was nothing but a malingering ruse.

B. <u>Dr. Melikian</u>

As to Dr. Melikian, while her diagnosis that Lindsey suffered major depressive disorder did not change, her explanation of how it affected Lindsey's cognitive ability changed utterly. The table in the Appendix details the differences, but one of the most compelling is her explanation of the significance of Lindsey's IQ tests shortly after his arrest.

At the PCR hearing, Dr. Melikian explained that Lindsey's depression dramatically impaired his cognitive ability. His IQ, as tested shortly after the murder, was 76, which placed him in the range of borderline intellectual functioning. When Dr. Brawley tested him almost two years later, it was 85, a number consistent with tests conducted years before the murder. Dr. Melikian was able to explain that Lindsey's depression was so severe that it caused the low score, signifying how much his ability to think clearly was impaired at the time of the murder. This would have tracked one of the statutory mitigators the sentencing jury (finally) heard about: Lindsey's mental and emotional state.

Also material is Dr. Melikian's cursory, rushed investigation before trial due to trial counsel's delay in hiring her. She did not have access to Tullis or Lindsey's phone message or suicide notes. Tullis and Lindsey's family members could have told her about Lindsey's self-harm and other details of his mental state.

Instead, the State was able to score points in its cross-examination of Dr. Melikian by forcing her to concede that she had not talked to a "single soul" who saw Lindsey the day of the murder. The State also showed that Dr. Melikian could not corroborate anything Lindsey had told her, a line of attack that could have been stifled had Dr. Melikian spoken with family members or Tullis.

C. <u>Jan Vogelsang</u>

Melikian surely would have benefitted from the exhaustive family history that Jan Vogelsang presented at the PCR hearing. Vogelsang's testimony demonstrated the abject failure of Lindsey's defense team to offer the jury a coherent narrative of Lindsey's life. Again, the Appendix table sets out her testimony in copious detail. Vogelsang was able to fill in compelling details of Lindsey's childhood poverty and to vividly illustrate that the poverty was not just economic. Although the home at times only had three spoons, there was pervasive dysfunction. He had no father in his life, and his mother was not a real caretaker. The home model was one of abandonment, desertion, violence, substance abuse, and dislocation (not to mention belief in voodoo and the use of the "roots"). Vogelsang's testimony contrasted

starkly with the brief, generic picture of his home life presented at the sentencing hearing. Unlike the initial defense team, Vogelsang had prepared explanatory charts and exhibits, including a genogram, a bread and butter mitigation exhibit. She demonstrated that Lindsey's family had pervasive mental health challenges, including several suicide attempts. Vogelsang's testimony pulled together the threads of Lindsey's life to provide the jury a complete narrative that would have allowed them to consider his moral culpability in full, and not just left them with disordered snippets of his story. Her testimony would also have enabled the jury to see how all the "stressors" working on Lindsey's mind–which was already "severely impaired" (in the words of Dr. Brawley, which the jury never heard about)–further disturbed his mental and emotional state at the time of the murder.

D. <u>Dr. Brawley</u>

Why trial counsel did not ask Dr. Brawley to testify is unknown. The majority opinion states that she testified at the PCR hearing in part about Lindsey's neuropsychological "deficits." Dr. Brawley's actual clinical characterization was much more pointed than that. She related that Lindsey's mental tracking, verbal fluency, naming ability, and verbal learning ability were all "severely impaired." Trial counsel's decision to let Dr. Melikian tell the jury about Dr. Brawley's report was insufficient and unreasonable, especially in light of the State's damaging cross-examination of Dr. Melikian.

## IV. The Standard for Ineffective Assistance of Death Penalty Counsel

To succeed on his PCR claim, Lindsey must prove both deficient performance by his trial counsel and prejudice. This is the familiar double prong test of *Strickland v. Washington*, 466 U.S. 668 (1984). There is little doubt that trial counsel was deficient. Professional standards in place impose an obligation on death penalty counsel to thoroughly and timely investigate their client's background. *Williams v. Taylor*, 529 U.S. 362, 395–96 (2000).

We have noted that evidence of mental impairment and low intellectual functioning is "powerful mitigating evidence." *Stone v. State*, 419 S.C. 370, 395, 798 S.E.2d 561, 574–75 (2017); *see also Tennard v. Dretke*, 542 U.S. 274, 288 (2004) ("Evidence of significantly impaired intellectual functioning is obviously evidence 'that might serve "as a basis for a sentence less than death."'" (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986))). The failure to adequately prepare and present mental health witnesses at the sentencing phase can amount to prejudicial ineffectiveness of counsel. *See Von Dohlen v. State*, 360 S.C. 598, 606–08, 602

S.E.2d 738, 742–43 (2004); *Council v. State*, 380 S.C. 159, 173–75, 670 S.E.2d 356, 363–64 (2008).

The purpose of a sentencing mitigation is to reduce the defendant's moral culpability for the crimes. To that end, as we have said, it is essential that trial counsel attempt to humanize his client and furnish a coherent narrative about his life history. *Weik v. State*, 409 S.C. 214, 234, 761 S.E.2d 757, 767 (2014) ("Evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background may be less culpable than defendants who have no such excuse." (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989))).

The death penalty lawyer has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Courts greatly defer to counsel's choices, and the field of discretion the lawyer enjoys in his representation is necessarily wide. But counsel's conduct must still be reasonable. Trial counsel's investigation started too late to have been effective. Ms. Topp was still desperately trying to gather basic records about Lindsey's life after the trial had begun. Any competent counsel would know that obtaining medical, school, and other protected records can be a difficult and drawn out process, even with a release from the client. Not beginning this process until a few weeks before trial was not just objectively unreasonable, it was reckless.

Relying on *Bobby v. Van Hook*, 558 U.S. 4 (2009), the majority opinion concludes that trial counsel's delay in preparing a mitigation case was reasonable. In *Van Hook*, though, the Supreme Court noted counsel started their mitigation investigation some three months before trial, and their investigation was both intensive and extensive. 558 U.S. at 9–12.

> Between Van Hook's indictment and his trial less than three months later, they contacted their lay witnesses early and often: They spoke nine times with his mother (beginning within a week after the indictment), once with both parents together, twice with an aunt who lived with the family and often cared for Van Hook as a child, and three times with a family friend whom Van Hook visited immediately after the crime. As for their expert witnesses, they were in touch with one more than a month before trial, and they met with the other for two hours a week before the trial court reached its verdict. Moreover, after reviewing his military history, they met with a

representative of the Veterans Administration seven weeks before trial and attempted to obtain his medical records. And they looked into enlisting a mitigation specialist when the trial was still five weeks away.

*Id*. at 9–10 (internal citations omitted).

I cannot share the majority's belief that trial counsel's delay here was reasonable. Like all mortals, lawyers can only control time on the front end. This Court should not signal that it is acceptable to wait until a month before a death penalty trial is to begin to start planning a defense to the penalty. Not to begin working on the sentencing mitigation until less than a month before trial is indefensible. Mounting a competent mitigation case takes months and to suggest that it can be effectively slapped together at the last minute is at odds with how the world works. Rome could have been built in a day, but no one would have ever lived there.

This level of neglect is more akin to that condemned in *Williams v. Taylor*, where trial counsel did not begin preparing a mitigation defense until a week before trial and, even then, bungled things by not pursuing obvious leads or obtaining fundamental records. 529 U.S. at 395.

The mitigation evidence at the sentencing trial was sterile and bland. It is true, for example, that there was evidence that Lindsey grew up in "desperate poverty." But such saccharine phrases, empty of corroborating detail, pack little punch with a jury, especially a jury that has already heard gut wrenching, granular details about Lindsey's murder of his children's mother. The only way to counter the weight of that and other aggravating evidence on the State's side of the scales would be to present Lindsey's story by way of a narrative that could help the jury understand his conduct. The underlying theme of the law surrounding death penalty sentencing is that the jury must be allowed to make an individualized determination as to the defendant's fate. *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) ("A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind."); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (the constitution requires that the sentencer "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death") (emphasis in original); *State v. Plath*, 281 S.C. 1, 15, 313 S.E.2d 619, 627 (1984) (holding it "is essential . . . that the jury have before it all possible relevant

information about the individual whose fate it must determine" (quoting *Barefoot v. Estelle*, 463 U.S. 880, 897 (1983))).

Mitigating evidence is not designed to remove responsibility for the crime. Instead, it is offered to ensure the sentence reflects the defendant's individual moral culpability for the crime. As the United States Supreme Court has stated, "[r]ather than creating the risk of an unguided emotional response, full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a 'reasoned *moral* response to the defendant's background, character, and crime.'" *Penry*, 492 U.S. at 328 (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 184 (1988) (O'Connor, J., concurring)).

The constitution commands that capital sentencing procedures permit extensive mitigation evidence to ensure the greatest punishment known to law is imposed only after a process of the greatest reliability. *Lockett*, 438 U.S. at 604; *see also Bowman v. State*, 422 S.C. 19, 36, 809 S.E.2d 232, 241 (2018) ("[T]he Eighth Amendment demands that a capital defendant be given wide latitude to present any relevant evidence of potentially mitigating value that might convince the jury to impose a sentence of life in prison instead of death.").

The Supreme Court recently summarized the court's task in deciding an ineffectiveness of counsel claim at the capital sentencing stage:

> When a capital defendant claims that he was prejudiced at sentencing because counsel failed to present available mitigating evidence, a court must decide whether it is reasonably likely that the additional evidence would have avoided a death sentence. This analysis requires an evaluation of the strength of all the evidence and a comparison of the weight of aggravating and mitigating factors.

*Thornell v. Jones*, 602 U.S. 154, 171–72 (2024). The Court in *Thornell* emphasized the defendant there was convicted of four aggravating factors related to "three gruesome killings, including the cold-blooded murder of a 7-year old girl," while attempting to steal a $2000 gun collection. *Id*. at 158, 170. Jones killed the little girl, her father, and her grandmother by beating them with a baseball bat. *Id*. at 158–59. He then used the stolen guns to pay for a trip to Las Vegas. *Id*. at 159. The majority noted Jones had not produced much new mitigation evidence, and much of what was new could not be causally linked to the murders. *Id*. at 166–70. The Court concluded that the new evidence would not have altered the picture of Jones the

sentencing jury saw. The Court stressed that, after weighing Jones' relatively weak mitigation evidence against the multiple, horrific aggravating circumstances, the balance was so lopsided in the State's favor that a court applying the correct legal standard would have "no choice" but to deny Jones relief. *Id*. at 172.

To support its reasoning, the Court highlighted several capital habeas cases where relief was granted. It noted these cases shared common traits: trial counsel had "introduced little, if any, mitigating evidence at the original sentencing," and the sentencer usually found only one aggravator and at most a "few." *Id*. at 171.

*Thornell'*s focus on weighing the mitigating evidence against the aggravating is important. After all, that is what the jury is supposed to do under South Carolina's statutory capital sentencing scheme. *See* S.C. Code Ann. § 16-3-20(B)–(C) (2015). But, at this stage of the PCR process, we are required to add the new mitigating evidence to the pan. *See Jamison v. State*, 410 S.C. 456, 466, 765 S.E.2d 123, 127–28 (2014). After doing that, it seems clear that Lindsey's "sentencing profile" bears little resemblance to the Lindsey the jury saw. Of course, it is possible that a new jury would reach the same verdict. But that is not the test. The test is whether there is a reasonable probability that the sentence would be different. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the first penalty trial. *Strickland*, 466 U.S. at 694. This inquiry means we must speculate as to whether it is reasonably probable that the new mitigation evidence would sway at least one juror to vote for a life sentence, rather than death. *Andrus v. Texas*, 590 U.S. 806, 823 (2020). The reasonableness inquiry takes into account not just the new mitigation proof, but compares it side by side with the aggravating circumstances. It is inescapable that Lindsey's crimes were brutal (what murder is not?), but they were fueled by the unchecked passion of a deluded father, a passion that was as wrong as it was compulsive and uncontrolled. A reasonable juror could likely conclude Lindsey's erratic and fatal choices deserve harsh punishment, but he should not be counted among "the worst of the worst." The aggravating circumstances in a capital murder trial are by definition heinous, but it must be remembered that there was only one aggravator here: "The offender by his act of murder knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which normally would be hazardous to the lives of more than one person." S.C. Code Ann. § 16-3-20(C)(a)(3) (2015).

There is no denying Lindsey's unhinged, fatal shooting of Victim while she was in a car with three others, including two children, and while she was seeking the refuge and sanctuary of the Inman Police Department was both cruel and reckless. But *Thornell* requires that we must in effect weigh or rank the aggravators. Is it reasonably probable a rational juror might weigh Lindsey's murder of his estranged

wife differently than the crude bludgeoning of a seven-year-old girl and her father and grandmother in the course of a home invasion and robbery?  Or a murder by poison or dismemberment?  Or murders committed by a serial killer, accompanied by rape and torture?  The catalog of evil is infinite, and *Thornell* reminds us that not all evil is created equal, and is not to be treated equally by a reviewing court.

This is not to say Lindsey's life before that fateful day was blameless.  He dealt drugs, beat Victim, and even shot one of his previous girlfriend's suitors in the arm.  But the question before us is whether Lindsey has shown there is a reasonable probability that one juror would have chosen life after hearing his full story.  Because he has, I respectfully dissent.

**Acting Justice Donald W. Beatty, concurs.**

# Appendix

| Evidence Presented at the Sentencing Hearing Versus at the PCR Hearing | | |
| --- | --- | --- |
| Witness | Sentencing Hearing | PCR Hearing |
| Virginia Lindsey (Mother) | • Mother testified that she raised Lindsey by herself, along with his three half-brothers.<br>• They lived in a "very small home."<br>• Mother worked, and the boys' uncle, Steve Pilgrim, would stay with them.<br>• Mother recounted how another of Lindsey's uncles backed over him in a car when Lindsey was twenty months old, injuring his head and leaving a scar. A month before this incident, he had ingested kerosene that had been left open in a jar beside the coal heater.<br>• Mother related that Lindsey was "slow" in school and had difficulty with his speech. He repeated several grades and dropped out at age seventeen in the ninth grade.<br>• Mother testified that Lindsey and Victim's relationship was "good"; although, they often would separate and then reconcile. | • Mother explained, for the first time, that until Lindsey was seven, they lived in a two-bedroom home with her mother, two or three sisters, two (sometimes three) of her brothers, her other three boys, and two of her sister's children. All told, nearly a dozen people were living in a home that had no indoor plumbing or central heat or air conditioning.<br>• Mother admitted she experienced emotional problems after the death of her seven-month-old daughter in 1969.<br>• Mother's PCR testimony also revealed for the first time that she had a live-in boyfriend, for some twenty years, who had a severe drinking problem and often became violent in front of Lindsey and the other boys, noting Lindsey often ran to his grandmother for help. Mother further testified that her sons, Lindsey included, sometimes took "the brunt" of her boyfriend's violence.<br>• Mother noted Lindsey "just had to live with" the violence because "he didn't have too much a choice" due to his young age.<br>• The family later moved to an even rougher neighborhood, where the children were exposed to drug dealing.<br>• Mother testified that her brothers Paul and Willie fought often and "beat their |

- Mother stated Lindsey's children were the most important part of his life, in part because his father had abandoned him.
- Mother told the jury that her sister, Bessie Smith, had attempted suicide. When trial counsel attempted to explore whether Bessie had been treated for a mental illness, the State's objection was sustained for lack of foundation (when Ms. Smith later testified, the trial court sustained the State's objection to her testimony on this matter as well).
- Mother confirmed Lindsey was hospitalized after attempting suicide at age fifteen.
- When Mother saw Lindsey three days before the murder, he was "very depressed" and talked of hurting himself if he did not get to see his children and "could not get [his] family back."

- girlfriends." She told of one incident when Lindsey and others were in the home, and her brother began shooting a gun in the house late at night.
- Mother also told of two other incidents when Lindsey was around six and fell and hit his head in the same spot, as well as a car wreck when he was sixteen that injured his eye.
- Mother also put Lindsey's suicide attempt at age fifteen into context. Mother had attempted to break up a fight between Lindsey and his older half-brother. After Lindsey held Mother down on a bed, Mother told him she would never do anything else for him and that she did not love him. This caused Lindsey to go into the bathroom and swallow an assortment of pain pills. He was hospitalized for several days and received inpatient psychiatric care for around two weeks.
- After he left school at seventeen, Lindsey lived with a girlfriend and began selling drugs, though occasionally taking legitimate employment.
- Mother explained that she met with Topp and second chair counsel only once before the trial. The interview occurred about two weeks before the trial and lasted one hour. She was never asked about Lindsey's detailed family background.
- Mother, for the first time, gave concrete detail as to what really occurred when she saw Lindsey three days before the murder. Mother had been called from work by her son

| | | Timothy Sims, who claimed Lindsey was about to kill himself. She and other family members went to Lindsey and calmed him down. Lindsey had prepared suicide notes for Mother and three other family members. Mother later gave these notes to Rod Tullis, Lindsey's former attorney. |
|---|---|---|
| Steven Pilgrim (Uncle) | <ul><li>Pilgrim stated he lived with Lindsey and his brothers during Lindsey's childhood (total of 7 years).</li><li>Lindsey was run over by a car as a toddler; Pilgrim took Lindsey to the hospital to be treated for head trauma.</li><li>Pilgrim confirmed Lindsey inhaled kerosene as a young child.</li><li>Pilgrim stated he suffered from mental illness, and his daughter suffered from and was being treated for panic attacks.</li></ul> | <ul><li>Lindsey's mother's childhood home included nine siblings and a father that never lived in the home.</li><li>Mother's siblings included Steven Pilgrim, Bessie Lindsey, Robin Pilgrim, Willie Pilgrim, and Paul Pilgrim.</li><li>Lindsey's Mother was suicidal during a period of Lindsey's childhood.</li><li>Lindsey's aunt Bessie Smith also attempted suicide during a period of Lindsey's childhood; Smith was hospitalized as a result.</li><li>Lindsey's aunt Robin attempted suicide on three occasions; she, too, was hospitalized multiple times.</li><li>Robin, as of the date of the PCR hearing, was incarcerated for an unnamed violent offense.</li><li>Willie and Paul have each been incarcerated for violent offenses.</li><li>When Lindsey was born, ten people lived in a four-bedroom house in Inman; Lindsey lived in that home until he was ten years old.</li><li>The house lacked indoor plumbing; it lacked air conditioning; the heating came from a furnace in which the family alternatively burned coal and wood.</li></ul> |

| | | |
|---|---|---|
| | | <ul><li>Lindsey's uncles Willie Pilgrim and Paul Pilgrim routinely exhibited violent behavior toward the family and toward other people in the neighborhood, including firing guns inside and outside the home.</li><li>When Lindsey was less than a year old, his uncle Paul accidentally ran over Lindsey's head with his car. Lindsey was hospitalized and underwent surgery on his head; he returned home that night.</li><li>Lindsey sustained other significant head injuries throughout his childhood because he was left alone to "crawl outside."</li><li>Weeks before the shooting, Lindsey was suicidal. His mother, brother, aunts, and uncle visited him for several hours the night his ideations were the most acute.</li><li>Lindsey was crying, and he was "not usually like that." Pilgrim had never seen Lindsey cry as an adult.</li><li>Trial counsel did not meet with Pilgrim until one day before the trial began; the meeting lasted between 20 and 30 minutes.</li><li>The meeting with trial counsel was a "group meeting"—it included the defense team as well as another family member, Lindsey's aunt Bessie Smith.</li><li>Despite knowing he suffered from depression and anxiety, trial counsel did not seek any medical or psychological release from Pilgrim concerning his history with mental health issues. Pilgrim would have "been glad to [provide] it."</li></ul> |

| | | |
|---|---|---|
| | | • At all times between the shooting in 2002 and the trial in 2004, Pilgrim lived in Spartanburg county and was available for questioning by the trial counsel team.<br>• Pilgrim would have asked the jury to show mercy at trial, but he was told not to by trial counsel. |
| Bessie Smith (Aunt) | • Smith stated she lived with Lindsey's family during a period of his childhood.<br>• When Lindsey was a child, he had a kitten he was "crazy about."<br>• Smith's brothers, Paul and Willie, without Lindsey's knowledge, threw the kitten into a furnace while it was alive, killing it.<br>• Lindsey was "hurt" and "talked about it for a long time."<br>• Smith attempted suicide at some point in her life (additional testimony as to this issue was objected to by the State, and the trial court sustained the objection). | • Smith had nine siblings, who were raised in childhood home of Smith and Mother.<br>• Lindsey's uncle Paul Pilgrim was one of the few male role models in Lindsey's life. Paul Pilgrim constantly fought other males and females in the neighborhood and abused alcohol.<br>• Lindsey's aunt Robin Pilgrim babysat Lindsey during his childhood. Robin Pilgrim has since been intermittently incarcerated following periods of drug abuse and homelessness.<br>• Mother's daughter, Vanessa, died as a child. Mother was left in a depressive state for nearly a year, often unable to get out of bed.<br>• When Lindsey was two years old, Mother's husband left Mother to be with another woman following the death of Vanessa. Mother began to abuse alcohol as a result.<br>• Mother's children, including Lindsey, "pretty much did for the[m]sel[ves]." Mother would "work all week and then on Friday night, when [she] got off work, then [she] would start drinking . . . and . . . go out."<br>• Lindsey's grandmother and uncles (Steve Pilgrim, Paul Pilgrim, and Willie Pilgrim) were responsible for |

| | | |
|---|---|---|
| | | Lindsey's care when he was still young.<br>• Lindsey and his other young siblings were often left in the care of their uncles or "whoever [else was] there" at nighttime while Mother and Grandmother left to play bingo.<br>• When Lindsey was 12 or 13 years old, he went to live with Smith for several months.   This move required some adjusting because Smith "didn't let [her] boys run around"; Smith's children played sports; Smith attended PTA meetings. Lindsey's mother, by contrast, "didn't do a whole lot of that" with Lindsey or Lindsey's siblings.<br>• While he lived with Smith, Lindsey desperately wanted attention. "[H]e liked being at my house because . . . he could get that attention and he . . could feel like he was at home. . . . He had that family home feeling when he was at my house."<br>• In Smith's home, there were rules. "[I]t wasn't all lovey dovey.  But we had that structure there. We had that foundation there. … But on the other hand . . . in [Mother's home], Marion and them pretty much had they freedom."<br>• Mother did not take an active role in Lindsey's (or his siblings') activities away from home, school, sports, or otherwise.<br>• Lindsey often lacked clean clothes to wear at school. He and his siblings would hand wash their clothes and shoes when Mother could not afford to take them to the laundromat. |

| | | |
|---|---|---|
| | | <ul><li>Lindsey's mother "never learned responsibility . . . [s]he didn't know what it was really to run a household. . . ."</li><li>When Lindsey was "15 or so," he attempted suicide by taking "a lot of pills."</li><li>Weeks before the shooting, Smith, Mother, and other family members went to Lindsey's house after Lindsey threatened to kill himself, recounting the same narrative as Pilgrim.</li><li>Lindsey was bereft at the threat of not having access to his children.</li><li>Lindsey "was really depressed at the time and he didn't want to—he act like he didn't want to live."</li><li>Lindsey's uncles "talked to Lindsey"; Smith told Lindsey he "need[ed] to pray" and eventually, everyone left.</li><li>No one sought to get Lindsey treatment that night.</li><li>Smith did not see Lindsey in-person after that night.</li><li>Lindsey remained distraught because he believed he was losing access to his children.</li><li>Sometime later, Smith spoke with Lindsey on the phone. Lindsey was upset and "was talking about his boys, talking about—said that [Victim] was trying to take the children away from him and he wasn't gonna get to see his children no more. She was telling him he wasn't gonna get to see his children no more."</li><li>Lindsey repeatedly said that Victim "don't want me to see my children. …</li></ul> |

| | | |
|---|---|---|
| | | She ain't gonna—she don't want him to see his children no more." <br>• The day after that phone call, Lindsey called Smith a second time. Lindsey had just been hired at BMW. Victim and Victim's mother took out warrants against Lindsey (impliedly with the knowledge that the police would visit Lindsey at his new workplace and he would lose his job as a result). <br>• Lindsey was crying on the phone, still distraught, two or three hours prior to the shooting. <br>• No more than a week before trial, trial counsel met with Smith to prepare for her testimony during the sentencing phase. The meeting lasted between thirty and forty-five minutes, and there was little to no discussion of Lindsey's family history. <br>• There was no formal preparation or practice before Smith testified at trial. |
| Leon McDowell (Father) | • When Lindsey was born, his father was married to someone other than his mother. <br>• McDowell admitted he "really wasn't a father to [Lindsey]." <br>• McDowell occasionally provided money for clothes or a bicycle, but played no role in Lindsey's emotional well-being. <br>• McDowell would not attend baseball games or other of Lindsey's school functions. | • Father did not testify at the PCR. |

| Timothy Sims (Brother) | • Sims did not testify at the sentencing hearing. | • Lindsey took over the role of parenting Sims when Sims was eleven years old and Lindsey was twenty-one years old. |
|---|---|---|
| | | • Lindsey was Sims' father-figure for eight years; Lindsey "treated [Sims] like a son, like he want his father to treat him. . . . because [Lindsey] never had a father." |
| | | • Sims lived with Lindsey and Victim while they were married. |
| | | • When Lindsey was dealing drugs, Lindsey spent the money he earned on his family and Victim's family, including their children. |
| | | • Several weeks prior to the shooting, Lindsey took Victim, their children, Sims, Sims' wife and newborn baby, and multiple others out to eat together. |
| | | • Shortly after that night, multiple family members, including Sims, went to Lindsey's house after learning that Lindsey was threatening to take his own life. |
| | | • In a phone call earlier that same day, Lindsey sounded "nervous and crying." |
| | | • Sims saw Lindsey cry "twice in [Sims'] life": once that night and once the day of the shooting. |
| | | • While the family members were at Lindsey's house following his suicidal ideations, Lindsey shared multiple suicide notes prepared for different family members, including one for Victim, one for his children, one for Sims, and one for Mother. |
| | | • None of Lindsey's family members took Lindsey to the hospital or |

<table>
<tr>
<td></td>
<td></td>
<td>

- otherwise sought professional help for him that night or after that night.
- Lindsey suspected Victim was "seeing another dude" and asked Sims to drive by Victim's home to confirm his suspicions.  Sims did so, and there was another car parked at Victim's house that did not belong to Victim.
- Sims lied to Lindsey about the presence of the vehicle to prevent "trouble."
- Sometime later, Lindsey asked Sims to contact Victim on his behalf because Victim would no longer answer Lindsey's calls.
- Sims called Victim the day before the shooting and listened to the call while Lindsey and Victim spoke.
- During the call, Lindsey said, "I understand you don't want to be with me no more, just let me get the boys. And she, she was upset already at him."
- Victim "started cussing" and replied "you not seeing them. I'm not dealing with you. We staying away from you."
- Sims heard one of Lindsey's sons in the background say "I want my daddy."
- Victim said, "no, you don't . . . that's not your daddy" and hung up the phone.
- The day of the shooting, Lindsey called Sims again and requested that Sims contact a third person on Lindsey's behalf.  Sims refused, but his roommate, Chawney, did as Lindsey asked.

</td>
</tr>
</table>

| | | |
|---|---|---|
| | | • Chawney later spoke with Lindsey again over the phone, and evidently confirmed Lindsey's suspicions that another man was with Victim.<br><br>• Lindsey then called Sims a second time, crying and distraught. Sims asked Lindsey to meet him at their brother's home to "talk about the situation." Lindsey agreed to do so but never showed up.<br><br>• The shooting took place shortly thereafter.<br><br>• Sims was well-integrated with the rest of the family and "was available" to talk with trial counsel. No one from the trial counsel team ever contacted Sims.<br><br>• Sims was present in the courtroom for the entire trial. He asked a member of the trial counsel to allow him to testify because Sims "kn[e]w more about [Victim] and Marion than anybody."<br><br>• Lindsey's trial counsel said they would get back Sims concerning his testimony, but, despite his request, Sims never took the stand.<br><br>• Sims admitted on cross-examination that he had been present at Applebee's when Lindsey removed Victim's jewelry and threw it in the road, but he claimed he never saw Lindsey physically assault Victim or tear her clothing.<br><br>• Sims admitted on cross-examination that Lindsey did not actually attempt suicide the night the family went to Marion's home.<br><br>• Sims admitted on cross-examination that Lindsey had multiple other |

| | | |
|---|---|---|
| | | girlfriends while married to Victim. On re-direct, Sims admitted to having suspicions that both Lindsey and Victim had relationships with others outside of their marriage, but that he was never able to confirm as much. |
| Rod Tullis (Lindsey's Former Lawyer) | • Tullis did not testify at the sentencing hearing. | • Tullis explained he was an attorney in Spartanburg, and he had represented Lindsey from the late 90s up until Victim's murder for criminal, family court, and traffic matters.<br>• Tullis explained he knew the details of Lindsey's life, and Lindsey also did some repair and mechanic work for Tullis.<br>• Tullis explained that in the weeks leading up to Victim's murder, Lindsey had met with him, his main concern was his children, and they had discussed "potential ways to resolve issues involving his children," including paying child support to secure visitation. However, Tullis did not know if this offer was ever actually made to Victim, and he admitted they didn't file anything in the family court, noting some concerns that such a filing would have affected pending drug charges Lindsey faced that Victim was potentially a witness in.<br>• Tullis also stated Lindsey spoke to him about how Victim was seeing another man, and he was concerned about this affecting his relationship with his children, essentially taking his place as the children's father.<br>• Tullis explained Lindsey tried to see him the day before the incident. He |

noted after he heard about the incident, he went to his office to prepare a notice of representation, and he listened to his answering machine, which used cassette tapes to record the messages. There was a message from Lindsey–made about an hour prior to the shooting–in which Lindsey stated he needed to talk to Tullis, and Lindsey sounded "very distressed, very distraught." Tullis explained he didn't sound angry or agitated, just "distraught, very emotionally down and upset. Not manic at all."

- Tullis explained he was the attorney of record on this case for a short time, but shortly after, Bartosh became the attorney on the case. He told Bartosh about the message and gave the audiotape to Bartosh.

- Tullis stated he visited Lindsey in prison after he was released from the hospital (following a surgery from his self-inflicted gun wound to the head). When he visited Lindsey, Lindsey was bleeding from the head because "he had been bashing his head against the concrete wall . . . and he had ripped . . . the stiches . . . and that he was attempting to kill himself by doing that." Tullis informed the jail about Lindsey's actions, and they put him on suicide watch. There was a jail incident report and photographs regarding this instance.

- While Lindsey was in jail, he would write letters to Tullis saying "he just didn't want to live" and wanted to kill himself. Tullis explained Lindsey's demeanor had not changed from the

| | | |
|---|---|---|
| | | voice message he left, rather he had "probably gotten worse, and it got worse over the weeks thereafter."<br>• Tullis also stated "sometime probably immediately after the shooting occurred," Lindsey's Mother gave him some suicide notes that Lindsey had written a couple of weeks before the shooting. Tullis provided these letters to Bartosh. Tullis explained the letters indicated "a clear intention to do harm to himself," and were "consistent with the state of mind [he] observed in those weeks leading up to the shooting and the weeks immediately thereafter."<br>• Tullis was not contacted by Lindsey's attorneys about the trial, which he found surprising because he thought he was "probably the best witness as to state of mind." He was subpoenaed by the State on May 21, 2004, and he went to the court and explained to the State the records he had provided to Mr. Bartosh and gave them documents he had at the time (this did not include the suicide notes).<br>• On cross-examination, Tullis explained Lindsey did not want to leave Victim or his family, noting Lindsey seemed confused about what he wanted. Mainly, Tullis stated Lindsey seemed scared to lose access to his children, and he noted in the weeks before the shooting, Lindsey had been denied access to his kids.<br>• Tullis did not recall having a conversation with Lindsey about the order of protection issued just days prior to Victim's murder. |

| | | |
|---|---|---|
| | | • Tullis admitted the voice message he received could have been left after the shooting, but insisted "it was contemporaneous" with the shooting whether it was before or after. However, he noted he didn't know how Lindsey would have been able to make the phone call after the shooting, as Lindsey himself was injured and arrested.<br>• Tullis stated he told the prosecution about the existence of the voice message, but he did not give it to them because he had already given the tape to Bartosh.<br>• Tullis stated he knew Lindsey was seeing other woman at the same time he was stating he wanted to get back together with Victim, and Tullis stated he expected Victim to file divorce proceedings. He was also aware of the domestic abuse charges and the series of incidents involving Victim. However, he stated Lindsey was not convicted of domestic violence.<br>• Tullis admitted he had been disbarred since the time of Victim's murder. |
| Vincent Bell (Paramedic at Scene) | • Bell did not testify at the sentencing hearing. | • Bell explained he was one of the paramedics who responded to the scene of the shooting and took care of Lindsey.<br>• He explained Lindsey was conscious at the scene, so he and the other paramedics asked him questions to try to ascertain how alert he was and if he was a danger to them. |

| | | |
|---|---|---|
| | | • Bell explained that when asked what happened, Lindsey stated "he shot himself . . . let me die." He also stated he shot himself and then his wife. |
| | | • He also admitted he shot his wife because "his wife was fooling around with somebody." |
| | | • Bell explained Lindsey was not cooperative as they treated him, "he basically told us that he wanted to die and let him die." |
| | | • On cross-examination, Bell stated he gave a written statement to police about his interactions with Lindsey, and in the written statement, he said Lindsey stated he shot his wife then shot himself. |
| | | • Also on cross, Bell stated he did not remember Lindsey ever mentioning his kids to the paramedics. |
| | | • Bell did not remember speaking to any of Lindsey's counsel prior to his trial or Lenora Topp, the investigator. |
| Ann Howard (Mental Health Professional) | • Howard testified she was a "professional, mental health professional" and registered nurse. | • Howard did not testify at the PCR hearing. |
| | • She stated she met Lindsey the day of the shooting. When she met Lindsey, he was suicidal, crying, depressed, and said he heard voices. She did not give him a diagnosis because she did not have enough information, but she believed he was depressed and thought he needed | |

| | | |
|---|---|---|
| | further assessment from a psychiatrist.<br>• She then saw Lindsey again two days later and made a deferred diagnosis of depression and got him in to see a psychiatrist.<br>• She noted Lindsey was prescribed an antidepressant, mood stabilizer, and an anti-psychotic.  She stated Lindsey continued to take medications in jail, though the anti-psychotic was changed to a different brand. | |
| Dr. Margaret Melikian (Expert in Forensic Psychiatry) | • She reviewed some of Marion's medical records; psychiatric hospitalization records; head injury records; school records; and reports where he was evaluated. She met with him on 5/4/2004.<br>• *School records* – Marion had problems and required learning disability classes, including speech therapy; he struggled in school and dropped out in ninth grade.<br>• *Physical injuries* – he was run over by a car when he was 18 months old and sustained head injury; he inhaled kerosene; had been in a motorcycle accident and a car accident and | • *Preparation* – Dr. Melikian testified she was contacted on 4/6/2004 by Bartosh but did not start reviewing his records until 4/28/2004. Before showing up to testify she had worked on the case for 7 hours 45 minutes. She only spent 2 hours and 45 minutes with Marion during her evaluation. Marion was her first death penalty trial, and she recalled receiving documents and being concerned that she could not prepare for trial. Dr. Melikian did not feel prepared to testify and tried to set up a conference call with Bartosh and the trial judge. She was the only one on the conference call from the defense. She expressed her concerns to the trial judge. She only spent 30 minutes on the phone with Bartosh the night before she was supposed to testify at the original trial. Also, Dr. Melikian learned in late April that Dr. Brawley would not be testifying |

sustained several head injuries.

- *Family history* – Has a family history of depression and had been treated psychiatrically after an overdose when he was 15; met diagnostic criteria for depression at that time.
- *Malingering* – Marion's records "had malingering on them" because he discussed hearing voices and a friend, Jimmy. He saw Dr. Brawley, who gave him a test to see if he was exaggerating a mental illness. Based on the results of that test, she did not make a diagnosis of malingering. Dr. Melikian explained Marion does not have the external incentive for malingering because he claimed that when he overdosed at 15 years old, his imaginary friend, Jimmy, came to visit him at the hospital, which was comforting to him. He claimed that whenever he gets stressed, Jimmy appears to comfort him. Dr. Melikian concluded Marion used Jimmy as a coping mechanism.
- *Mental state* – Marion said he had been suicidal for weeks leading up to the incident and was actually

and, instead, Dr. Melikian would testify as to Dr. Brawley's report at trial. She did not feel comfortable doing that, so she requested a written report from Dr. Brawley.

- *Records* – Dr. Melikian did not receive all the records that were available or that she requested before trial. Bartosh did not provide the suicide notes, Marion's complete medical records, DOC records, or an incident report. Dr. Melikian said this information would have been important for her evaluation. She never received corroborating pictures about his suicides attempts – specifically of Marion banging his head on the wall when he was arrested after the incident. When she performed her evaluation, she did not give it much weight.
- *Malingering* – Dr. Melikian learned since trial that during Marion's evaluation, he was pulling chairs out for Jimmy. She did not know that Marion spoke with Brannon and Bartosh about Jimmy before trial and this information would have been beneficial before trial. Also, had she known all of the information available about Jimmy, she would have focused her evaluation differently.
- *Family history* – Dr. Melikian did not know much of Marion's family history and confirmed it's better to have other family or evidence corroborate his reports. She only learned about Marion's history during his one evaluation and from Topp the day of trial.
- *Conclusion* – Knowing what she knows now, Dr. Melikian would have better

planning a suicide; he experienced decreased appetite, weight loss, feelings of hopelessness, and a sad mood. He met the criteria for depression at the time of incident. She described his depression as recurrent but could not determine whether it was chronic or acute since she did not know when his depression started. Marion wanted to commit suicide. He claimed that on the day of the incident, he just snapped and did not know his wife was shot until EMS told him. He told Dr. Melikian he asked EMS if they would just let him die.

- *Testing results* – On testing, Marion was found to have below-average IQ. He was previously diagnosed with borderline intellectual functioning (diagnosis used for someone functioning close to the mildly mentally retarded range). However, after running tests, Dr. Melikian would not classify him as borderline intellectual functioning. Marion had cognitive deficits, or problems in thinking or acting; verbal fluency; processing memory; and dexterity.

explained the diagnosis she made because she did not understand the seriousness of Marion's depression around the time of the incident. She had no family history and not enough time with Marion to determine his functioning. She would have explained his diagnosis differently at trial. Since trial, she has visited him three times and believes she misjudged his cognitive ability and diagnosis since the first time she met him.

- Dr. Melikian did not understand the severity of Marion's depression and was unaware of his phone call to Tullis, which would have been important in evaluating his mental state at the time of the incident.
- At the original trial, the only school records she had were his grades.
- She was unaware Jimmy first appeared in the record on the day Marion was served with the State's intent to seek the Death Penalty. This information would have been important so Jimmy could have been dealt with before trial. She now knows Marion was malingering Jimmy because some inmates told him to do it. If she had more time to meet with him before trial, she would have been aware of that information and provided much more effective testimony.
- She diagnosed Marion with a major depressive disorder before the trial in 2004. She would still make that diagnosis today, as he still met the diagnostic criteria.

These are all indicators of brain damage and brain abnormality, either genetic or from the trauma he experienced as a child. Marion had limited ability to cope due to his decreased intelligence in general. He had poor coping skills, as evidenced by Jimmy, his imaginary friend. His neurological problems appeared chronic because he had a history of problems in school.

- *Conclusions* – Marion had had abnormalities with naming and the ability to copy designs; dexterity and fine motor skills. She further concluded he had cognitive deficits and that he suffers from major depressive disorder. She recommended he see a behavioral neurologist.
- She was not provided DOC records for Marion's time served for assault and battery with intent to kill.
- She learned there was no mention of Jimmy until Oct. 10, 2002, the date the State sought the death penalty. She was also unaware that Jimmy was present for an interview conducted by Dr. Narayan on 7/18/2003.

| | | |
|---|---|---|
| | • She was unaware that he lied on a job application and claimed he finished high school. Bartosh did not provide this information, and she said it might have been helpful to know this information.<br>• She clarified that his depression was acute. | |
| Dr. Tora Brawley (Expert in Clinical Psychology) | • Dr. Brawley did not testify at the sentencing hearing. | • Bartosh called Dr. Brawley on 4/12/2004 and she initially declined to work on the case because it was too short notice. She had a cancellation and was able to see Marion on 4/27/2004. Bartosh gave her no records. She was only told there was a history of head trauma, a gunshot wound, and a car accident. After the evaluation, she provided Bartosh with the results but could not recall why she was not asked to testify.<br>• She performed an extended clinical interview and neuropsychological tests. She provided verbal results to Dr. Melikian and Dr. Absher (a neurologist).<br>• Marion reported that he fell on the steps, hit his head 4-5 times, he'd been run over by a car; was in the hospital for two weeks at one point; had surgery on his face; experienced 2-3 motorcycle wrecks – one with no helmet; a self-inflicted gunshot wound to the head in 2002; and a history of migraines. He claimed to have dropped out of school in the tenth grade. |

| | | |
|---|---|---|
| | | - *Malingering* – She conducted a test to figure out whether he was malingering–the only indication she had at the time of trial was that Bartosh told her about the imaginary friend and was aware that other doctors had diagnosed him with malingering. She did the memory malingering test, which is a recognition test, and he scored completely within normal limits. For malingering for psychiatric symptoms, he scored within normal limits. She said there was no indication he was malingering. On cross, Dr. Brawley said she asked Marion about Jimmy. Marion said Jimmy was like a role model, and he came to him at age 12 when he first tried to kill himself. He further claimed God sent him Jimmy to "help him out" and that he talks to Jimmy when he has a problem. Marion said Jimmy was not there in the meeting with them on 4/27.<br>- ***Comparison to William S. Hall findings*** – When Marion was evaluated during his time at William Hall, the doctor who performed the evaluation there performed the same tests, which had different results; she said this could be due to the depression.<br>- *Findings* – There were some scattered neuropsychological deficits, including severely impaired speed of mental tracking (i.e., ability to sequence, like ABC's); severely impaired verbal fluency; severely impaired confrontation naming (i.e., ability to name objects); below average verbal |

| | | |
|---|---|---|
| | | memory; delayed visual memory; severely impaired verbal learning ability; and impaired ability to copy and recall a complex figure. Her conclusion was that he fell below the average range of normal brain function. However, because she had no records, she could not say whether the cognitive deficits were due to head injuries. |
| Jan Vogelsang (Expert in Clinical Social Work and Bio-pyschosocial Assessments) | • Vogelsang did not testify at the sentencing hearing. | • Vogelsang interviewed Marion Lindsey, Virginia Lindsey, Bessie Smith, Steve Pilgrim, Timothy Sims, Patsy Burton, Rob Tullis, and Dr. Tora Brawley. She evaluated the family history, including mental health records of family members and any available court records. She reviewed Marion's medical, mental health, high school, and DOC records, his prior arrests, suicide letters, and records that were gathered after the incident. She visited the community where Marion lived.<br><br>• ***Family history/patterns of behavior*** – His family exhibited patterns of abandonment and desertion. They lived in extreme poverty, meaning the children went hungry. Marion's grandfather was sexually inappropriate with several boys in the family. Marion's mother was abandoned by her father and raised by a mother who was unable to care for her children; she was sick often. Marion's father abandoned the family. Marion's mother was married before she met Marion's father. She had three children with her previous husband but five pregnancies, with 2 miscarriages. She |

suffered the loss of her daughter when she was 7 months old a few years before Marion was born. She never had intervention, treatment or grief counseling. After her child died, she partied, had several boyfriends, and was not present or at home for her children. Marion was cared for by his grandmother. There were patterns of divorce and separation, abuse, neglect, and abandonment in his home. There was a pattern of suicide attempts in his family – both his aunts had drug problems and attempted suicide; his other checked herself into the ER for an overdose following a conflict with Mr. Sims. Marion's brother, Fred, drowned. Marion felt guilt about their relationship and became depressed when Fred passed away.

- *Violence at home* – Marion grew up witnessing violence. He had no one in his home guiding him, which affected his ability to determine how to behave in certain situations. He had no strong male influences. His family members resolved problems in relationships with violence. He witnessed his family members deal and use drugs between age 11 and 13. Marion watched his uncles beat their girlfriends and each other; some of his family members were charged with domestic violence, assault and battery with intent to kill. Marion witnessed his mother shoot at Mr. Sims. His uncles were in and out of prison – one of his uncles beat a man to death. The others were in trouble with the law for drugs and violent behavior. Marion witnessed his

uncle throw his favorite pet into a fire. Marion's family practiced roots, which was confusing for him. His family members would "put roots" on their girlfriends or wives to make them sick or make them die.

- *Living conditions* – When Marion was born, there were aunts and uncles living in the house. The living conditions in Marion's childhood home were crowded, with ten people often living in the home at one time. There was no indoor plumbing or hearing, and the neighborhood was considered "rough."
- *Injuries* – Marion fell a lot as a child and would often have stitches in his head. He was run over by a car when he was very small, and his family delayed sending him to the hospital due to lack of resources.
- *School* – Marion failed first grade. He started exhibiting behavioral problems when his mother started working third shift in eighth grade. He had to repeat eighth grade twice and dropped out of school before finishing eighth grade. When he dropped out, he became a drug runner in the neighborhood. The only one to graduate high school in his family was his Aunt Robin but she left the home to raise her own children.
- *Mental state* – When Marion was 15, he took somewhere between 45 and 60 medications at one time and tried to take his life. He received treatment at the hospital, but his mother resisted the doctor's recommendations.

| | | |
|---|---|---|
| | | • ***Relationships*** – Marion was very reactive in romantic relationships. He shot one of his previous girlfriend's boyfriends. Marion had a chaotic relationship with Nell, the mother of his children. He was arrested for CDV during their relationship.<br>• ***Conclusion*** – There were so many stressors in Marion's life from the time he came into the world that it would be reasonable to conclude that it affected his insight, judgment, impulsivity, and decision-making and placed him at higher risk of committing a serious act. |
| Lenora Topp (Mitigation Investigator) | • Topp did not testify at the sentencing hearing. | • Topp testified she started working on Lindsey's case on April 16, 2004, approximately a month before trial, and her job was "essentially a fact finder, getting records as needed, and . . . meeting with witnesses as necessary."<br>• She spent approximately forty hours working on Lindsey's case before his trial began. She believed she did not have enough time to work on Lindsey's case, explaining it takes time to cultivate a relationship and get information from a defendant's family and that she was still seeking records during the trial.<br>• She had never worked on a death penalty case before, had never been a mitigation investigator before, and had never worked on a South Carolina case before.<br>• She explained she mainly tried to get to know about Lindsey's background through family members. |

| | | |
|---|---|---|
| | | <ul><li>Mother told Topp about Dr. Barry Henderson (accidently giving Topp the wrong name–Hennison–but Lindsey eventually told Topp the right name during the trial), Lindsey's childhood doctor, and she attempted to find Dr. Henderson for medical records and to be a witness.   Once Topp was able to get into contact with Dr. Henderson, the day after trial on May 25, 2004, Dr. Henderson stated he would have testified for Lindsey and how in the past he trusted Lindsey to play with the doctor's children.  Dr. Henderson passed away prior to the PCR.</li><li>She was never asked to interview Rod Tullis.</li><li>Lindsey told Topp about his upbringing, being raised poor, not having his father in his life, being run over by a car.  He also spoke about his desire for his kids to not be without a father figure like him.</li><li>He told Topp he could not remember "half" of what happened when he shot Victim, but "he was very upset about the, his wife having an affair with a gentleman who was going to take over raising his children."  He told Topp he just wanted to know what was going on with his kids, but Nesbitt and Victim took off.  He remembered following them, and that he shot into the car.</li><li>Lindsey told her his mother's and father's names, and he indicated he had hatred towards his father because his father never had anything to do with him.</li></ul> |

|  |  | <ul><li>Lindsey explained growing up they only had enough clothes for two days and had to wash their clothes every other night, drying them on a wood heater.</li><li>He also explained he was severely emotionally affected by the death of one of his brothers who drowned seven years prior. Lindsey's brother's body was never found.</li><li>He discussed only eating bologna sandwiches as a child because it was all they could afford, and how he hated bologna now, refusing to eat it when it was served at the jail.</li><li>He admitted he sold drugs to support his family, so he could have a better life-style for his kids. However, he claimed he never used drugs.</li><li>Topp admitted Lindsey got into fights at school with both other boys and some girls.</li><li>Lindsey told Topp about his uncles throwing his cat into a wood heater.</li><li>After Lindsey quit school, he got into a bad car accident, wherein his car flipped three times, he had memory loss after the accident, had to have facial surgery, and his hip broke.</li><li>He told Topp about his romantic relationships. He also spoke about his relationship to Bill Burton.</li><li>Topp stated based on her conversations with Lindsey, she believed he had a hard time in life, had turned to drug dealing to take care of Victim and their kids.</li><li>She also mentioned Lindsey told her he "was just resigned to dying and his</li></ul> |

| | | |
|---|---|---|
| | | biggest regret is not having enough time to spend with his children."<br>• Topp also looked for mental health records for Bessie Smith, Lindsey's aunt.<br>• Topp stated she was not sure if they had all of Lindsey's school record even at the time of the PCR.<br>• Topp suggested to Bartosh that mental health issues ran in the family and that he should subpoena family members who had these issues, such as Bessie Smith, Steve Pilgrim, Paul Pilgrim, and Mother. |